RICHARD F. COOL AND ANOTHER v.
STANLEY S. HUBBARD AND ANOTHER.

199 N. W. 2d 510.

June 23, 1972—No. 43263.

*Leonard, Street & Deinard, Charles A. Mays,* and *Lowell J. Noteboom,* for appellants.

*Eastwood & Goyer* and *Philip H. Eastwood,* for respondents.

Heard before Knutson, C. J., and Otis, Todd, and Gunn, JJ.

WILLIAM D. GUNN, JUSTICE.*

Defendants, Stanley S. Hubbard and Karen E. Hubbard, ap-

---

*Acting as Justice of the Supreme Court by appointment pursuant to Minn. Const. art. 6, § 2, and Minn. St. 2.724, subd. 2.

peal from a judgment entered following trial of an action by plaintiffs, Richard F. Cool and Helen M. Cool, for specific performance of a contract or damages and a counterclaim for reformation of the same contract. The trial court granted plaintiffs' request for specific performance but allowed them no damages and denied defendants' request for reformation.

The primary questions in this case are whether a mutual mistake or a unilateral mistake occurred in the formation of the sales agreement in which defendants agreed to sell, and plaintiffs agreed to buy, a 23-acre tract of land located in Washington County. The tract in question is roughly rectangular in shape and lies a short distance from the St. Croix River. In the southwest corner of the property, a hill, or high bluff, rises and extends for some distance through an adjoining tract of land to the south. This bluff property commands an impressive view of the St. Croix River valley and for that reason has value as a scenic home or apartment site. A deep ravine is so situated on the 23-acre tract that it renders the bluff property inaccessible to vehicular travel from the remainder of the tract. The only vehicular access to the bluff property is via adjoining property not owned by plaintiffs.

A full understanding of the factual background requires an analysis of the events leading up to the institution of this lawsuit as they occurred in basically three stages.

*Pre-negotiation stage:* Originally the 23-acre tract in question was part of a larger tract that belonged to Stanley E. Hubbard (Hubbard, Sr.), the father of defendant Stanley S. Hubbard (Hubbard, Jr.). Hubbard, Jr., first took possession of the 23-acre tract in 1959 but did not acquire title to the property from Hubbard, Sr., until 1965. Hubbard, Jr., had a survey made of the tract on February 17, 1964, for the purpose of determining a legal description to place in the deed from Hubbard, Sr. This survey is of interest because the only topographical feature depicted, other than buildings and roads, is the bluff area, which

is designated by hash marks and is clearly included within the boundaries of the survey. Another survey, made on March 2, 1965, contains a similar designation of the bluff property. In both surveys the hash marks are accompanied by the following caption, "Approx. top [of] hill." In his testimony at trial, Hubbard, Jr., stated that although he had seen the markings which designated the location of the bluff, he had thought they designated a smaller hill located to the north of the bluff property, and this mistake was not discovered because he never paced off the boundaries. Hubbard, Jr.'s contention at trial was that at no time before or during the negotiations for the sale of this property did he believe that the bluff property was included in the tract conveyed to him by his father. Nevertheless, there is no dispute that the legal description contained in the deed his father gave him included the bluff property. Nor is there any dispute that a mortgage placed on 12.8 acres of the tract by defendants in March 1965, and assumed by plaintiffs when they purchased the tract, included the bluff property.

*Negotiation stage:* Hubbard, Jr., and plaintiff Richard Cool had been business and social friends for some time, and thus plaintiffs visited defendants in their home on the property on several occasions. During the fall of 1965 the Cools learned of the Hubbards' desire to sell the property, and the parties began to negotiate the sale at that time. In September or October of 1965, Hubbard, Jr., gave Cool surveys and an appraisal of the property. These surveys included the two described above which included the bluff property as well as a third survey made in July 1965 for the purposes of assuring access to Hubbard, Sr.'s adjoining property and to eliminate the northerly portion of the tract so that a gravel pit in that area would be excluded. This latter survey did not include the bluff property. The appraisal report given by Hubbard, Jr., to Cool for his study contained the same legal description as that found in Hubbard's deed, which, of course, included the bluff property. Hubbard, Jr., testified, however, that he personally showed the appraiser the boundaries

of the tract and in doing so excluded the bluff property. Thus, it was contended by Hubbard, Jr., at trial that the appraisal figure of $40,000 excluded the bluff property regardless of how the legal description read.

Plaintiff Richard Cool, on the other hand, testified that he had no idea throughout the entire negotiation period that Hubbard, Jr., did not desire to include the bluff property in the tract. In fact, he had no idea where the exact boundaries were located when negotiations began. Cool testified that he first became aware that the bluff property was included when, with the assistance of a surveyor's helper, he walked off the boundaries of the property. Sometime thereafter Cool had another appraiser give him an oral appraisal of the property, based on the boundaries, as he, Cool, understood them. This appraiser also found the value of the tract to be $40,000. Cool testified that he had subsequently mentioned the bluff property to Hubbard, Jr., several times during casual conversations but got no response. Hubbard, Jr., denied that Cool ever made such references.

Defendants prepared a contract for deed to the 23-acre tract and the parties signed it on May 5, 1966. Again, it is without dispute that the legal description contained in that contract for deed was the same as that used in the earlier surveys, the appraisal, and Hubbard, Jr.'s deed, all of which included the bluff property. Nevertheless, Hubbard, Jr., testified that on the date the contract for deed was signed he did not intend to convey the bluff property and did not know it was included within the legal description in the contract for deed. Cool, on the other hand, testified that he had no reason to believe at that time that Hubbard, Jr., did not know the bluff property was included.

*Postnegotiation facts:* The first indication that a dispute existed over the bluff property came when Cool and Hubbard, Sr., had lunch together during August 1966. The subject of the bluff property arose, and Hubbard, Sr., informed Cool that none of the bluff property had ever been sold. Cool testified that this was the first time he knew that there was any question about

the inclusion of the bluff property within the tract he had purchased. Hubbard, Jr., testified that this was the first he knew of Cool's understanding that it was included.

Cool testified that later that month Hubbard, Jr., visited him at his home and requested that an adjustment be made in the deed. He testified that Hubbard, Jr., even offered to buy it back, to which Cool replied that such an arrangement was unnecessary because he would gladly give Hubbard, Sr., a life estate in the bluff property. Hubbard, Jr., denied making any such offer. He testified that he had heard Cool and Hubbard, Sr., discuss the problem several times in the latter's office with a final resolution that Hubbard, Jr., had nothing to convey and thus the deed would have to be changed. Cool denied that any such resolution was reached. There was no evidence that a reformed deed or contract for deed was ever prepared or offered to the Hubbards by Cool.

Three other witnesses testified that Cool had indicated to them that he did not have rightful title to the property. William McGivern and Ralph Dolan testified that Cool had told them in 1968 that Hubbard, Sr., owned the bluff property and had referred to it as the property he had purchased by mistake. Another witness, Peter S. Popovich, testified that in March 1970 Cool had told him that the bluff property belonged to Hubbard, Sr. Cool admitted having had conversations with those three men but denied having made the comments they attributed to him.

The evidence indicates that this action was begun soon after Cool and Hubbard, Jr., had a difference of opinion concerning the operation of a local hockey association of which they were both directors. This dispute resulted in the removal of Cool from his position. At trial Cool admitted having felt some rancor toward Hubbard, Jr., immediately after the dispute, but he testified that those feelings had dissipated before he instituted this lawsuit.

There was no motion for a new trial in this case. This court has said that upon appeal from a judgment, where no motion for

a new trial has been made, our review is limited to a determination of whether the evidence sustains the findings of fact and the findings support the conclusions of law. Donaldson v. Kohner, 264 Minn. 230, 232, 118 N. W. 2d 446, 448 (1962).

Rule 52.01, Rules of Civil Procedure, applicable where there are findings of fact by the trial court sitting without a jury, provides in part:

"* * * Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."

In the recent case of In re Estate of Balafas, 293 Minn. 94, 198 N. W. 2d 260 (1972), this court indicated that a broad scope of review exists under Rule 52.01. However, even after the extensive review permitted by Rule 52.01, we have, for reasons now to be stated, concluded that the decision of the trial court must be affirmed.

As indicated, the principal issues presented are whether or not either a mutual mistake or a unilateral mistake occurred in the formation of the sales agreement. Similar issues have been presented to this court on several occasions. Reference need only be made to two cases.

In Fritz v. Fritz, 94 Minn. 264, 266, 102 N. W. 705, 706 (1905), we said:

"* * * Before a court of equity will interfere to reform a written instrument it must appear, substantially as alleged in the pleadings, that there was in fact a valid agreement sufficiently expressing in terms the real intention of the parties; that there was in fact a written contract which failed to express such true intention; and that this failure was due to mutual mistake, or to mistake of one side and fraud or inequitable conduct of the other. * * * These facts must be established by competent evidence, which is consistent and not contradictory, clear and not equivocal, convincing and not doubtful. Mere preponderance of testimony is not sufficient. * * * Such relief will be

extended to those only who have not by their own conduct (as laches, negligence, or otherwise) put themselves in such a position as to render it unjust to change the situation, especially when such change might injuriously affect the rights or status of innocent third parties."

In Abramson v. Nelson, 263 Minn. 308, 314, 116 N. W. 2d 405, 409 (1962), after quoting with approval the rule stated above from Fritz, we said:

"That rule may be qualified where a unilateral mistake is coupled with fraud or inequitable conduct or concealment of known facts by the party unmistaken. In Farmers' Store v. Delaware Farmers' Mutual Fire Ins. Co. 240 Minn. 170, 174, 59 N. W. (2d) 889, 892, we said:

" 'Where the right of reformation is predicated upon mutual mistake and there is no evidence of fraud or inequitable conduct, the evidence to justify reformation must be clear, precise, and convincing. * * * It must establish that the instrument sought to be reformed fails to embody the actual agreement between the parties and that the failure in this respect was due to the mutual mistake of the parties rather than the unilateral mistake of one party.' "

Clearly, the evidence, which we have fully reviewed, supports the trial court's refusal to find mutual mistake in this case. Nor do we find in this record any evidence of fraud, inequitable conduct, or concealment of known facts on the part of the Cools to justify reformation on the ground of unilateral mistake.[1] To the extent that there was conflict in the testimony, it was the function of the trial court to resolve that conflict. It did so. Applying

---

[1] The trial court made no specific finding on the issue of unilateral mistake, probably because it was not pleaded, although evidence received without objection sufficiently covered the issue, and defendants, in the motion for amended findings, asked the court to rule on the subject. In any event, the rule is that "[a] failure to make findings when none in favor of appellant would be justified is harmless error." 19 Dunnell, Dig. (3 ed.) § 9866.

the rule of In re Estate of Balafas, *supra,* we conclude that nothing appears in the record to justify interference by this court with the decision of the trial court.

Affirmed.

MR. JUSTICE MACLAUGHLIN, not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.