## THEISEN'S INC. v. RED OWL STORES, INC.

243 N. W. 2d 145.

June 4, 1976—Nos. 45626, 46170.

*Gray, Plant, Mooty & Anderson, Robert V. Bolinske, Mark A. Nordenberg,* and *James S. Simonson,* for appellant.

*Karlins, Grossman, Karlins, Siegel & Brill, J. E. Brill, Jr.,* and *James R. Greupner,* for respondent.

Heard before Kelly, MacLaughlin, and Yetka, JJ., and considered and decided by the court en banc.

KELLY, JUSTICE.

Defendant, Red Owl Stores Inc., appeals from an order denying its motion for a new trial and from a judgment of the district court refusing to reform a lease and ordering judgment against defendant for back real estate taxes in accordance with one of its provisions. We reverse.

Plaintiff, Theisen's Inc., formerly known as Theisen's Market, Inc., and defendant entered into a lease agreement dated June 2, 1965, wherein Theisen's, as lessor, agreed to construct a build-

ing in which lessee Red Owl would operate a grocery store. The lease provides that Red Owl will pay Theisen's 80 percent of any increase in general real estate taxes and 50 percent of any increase in special assessments over those payable in a prescribed base year. The lease clause describing that base year reads in relevant part as follows:

"8. In the event the general real estate taxes against the demised premises currently due and payable in the second or any subsequent calendar year of the lease term after the demised premises have been completed shall exceed the general real estate taxes against the demised permises *currently due and payable in the first full calendar year of the lease term after the demised premises have been completed,* then Lessee agrees to pay to Lessor, upon receipt of the appropriate tax statement indicating payment thereof, eighty percent (80%) of such excess. In the event the special assessments and installments of special assessments against the demised premises currently due and payable in the second or any subsequent calendar year of the lease term after the demised premises have been completed shall exceed the special assessments and installments of special assessments against the demised premises currently due and payable in the first full calendar year of the lease term after the demised premises have been completed, then Lessee agrees to pay to Lessor, upon receipt of the appropriate tax statement indicating payment thereof, fifty percent (50%) of such excess." (Italics supplied.)

It is undisputed that the store was completed by August 1966, making 1967 the base year under the lease as drafted. Red Owl, however, seeks reformation of the lease, contending that the words "currently due and payable in" the base year were inadvertently changed from "levied in" the base year. Thus, Red Owl argues, the base year intended by both parties was not 1967 but 1968, the first year taxes were levied on the land and the completed store. The economic reason for Red Owl's contention is

clear—if the lease as written is followed, Red Owl will pay 80 percent of the taxes in excess of the 1966 assessment (due and payable in 1967), which was based on vacant land, as opposed to 80 percent of the taxes in excess of the 1967 assessment (due and payable in 1968), which was based on land plus the completed store.

Initial negotiations concerning the lease began in October 1964, and were conducted between Leonard Egge, then Red Owl's assistant real estate manager, and John Theisen, Sr., then president of Theisen's Inc. Those negotiations covered certain proposed revisions in the Red Owl standard form lease not relevant to the instant case. At the conclusion of this initial negotiation process, Egge submitted the revisions to Richard Johnson, Red Owl's house counsel, and Johnson prepared a draft of the lease with a rider containing the following real estate tax clause:

"7. In the event the general real estate taxes *levied* against the demised premises in the second or any subsequent full calendar year of the lease term after the demised premises have been completed shall exceed the general real estate taxes *levied* against the demised premises in the first full calendar year of the lease term after the demised premises have been completed, then Lessee agrees to pay the Lessor, upon receipt of the appropriate tax statement indicating payment thereof, eighty percent (80%) of such excess; * * *." (Italics supplied.)

Johnson's lease draft was sent by Egge to Loren Babcock, an attorney hired by Theisen, on March 12, 1965, for review on behalf of Theisen. Babcock drafted a set of proposed revisions which included a change from "levied" to "currently due and payable" in reference to the base year in the real estate tax clause. These proposals were generally discussed at a meeting among Theisen, Babcock, Egge, and Johnson on March 29, 1965. At trial, neither Egge nor Johnson could recall any discussion about Babcock's changing "levied" to "currently due and payable." Both Theisen and Babcock were dead at the time of trial.

Following further discussions, exchanges of letters, and revisions, none of which refer to the tax clause change at issue here, Babcock drafted a second revision of the clause which added a provision that Red Owl would pay 50 percent of the special assessments, not 80 percent as originally proposed by Babcock. This second revision became a provision in the final lease that was executed on June 2, 1965.

Both Egge and Johnson testified at trial that Babcock's change in the tax clause was incorporated in the final lease by mistake. Johnson testified that he had noticed Babcock's change when he examined Babcock's revision of March 31. At that time he made marginal notations on his copy of the draft indicating that "in" in the phrase "currently due and payable in" should be changed to "with respect to." He apparently did not follow through on his notations, however, and the lease was executed with Babcock's language.

At trial, Robert Boblett, a real estate expert with extensive experience in the type of lease involved in the instant case, testified for Red Owl as to the concept of base year in tax clauses:

"* * * And, the base year, to make any sense out of it and to accomplish the objective of landlord and tenant would have to be a year in which the taxes were the full load for the long pull."

Roy A. Moberg, a loan officer of Thorpe Brothers, Inc., which obtained financing for the construction of the store, also testified that he had calculated the estimated real estate taxes based on the completed store when he evaluated the loan.

No tax bills were sent by John Theisen, Sr., to Red Owl in 1966, 1967, or 1968. The first tax bill sent in June 1969 was handwritten by him and appears as follows:

"6-1-69

"Red Owl to Theisen Inc.

| | |
|---|---:|
| "Taxes payable in 1969 | 10,365.76 |
| "Taxes payable in 1968 | 9,112.36 |
| | 1,253.40 |

| | |
|---|---:|
| 80%— | 1,002.70 |
| "Taxes for Lot 16 Payable in 1969 | 227.62 |
| Due Theisen, Inc. | 1,230.32 |

"Mr. Dixon

"This is a statement for your Fridley store.

"Thanks

J. L. Theisen"

Other bills were sent in November 1969, June 1970, and November 1970. *All of these bills used 1968 as the base year for computing Red Owl's liability for tax increases, not 1967 as provided in the lease.* Some of the bills also charged Red Owl for the full amount of special assessments, instead of the 50 percent provided in the lease. Red Owl paid all bills without objection. There is no evidence that Red Owl gave Theisen any advice or counsel on these billings.

After the death of John Theisen, Sr., his sons discovered that the lease, as written, was not being complied with. The corporation then brought an action to recover back taxes allegedly owed. Red Owl, in response, sought reformation and counterclaimed for amounts it claimed to have overpaid. The trial court denied reformation and ordered judgment for plaintiff on its claim for taxes.

The single issue that is dispositive of this appeal is as follows: Is there clear and convincing evidence of a mutual mistake in the tax clause? We hold that there is and that the trial court erred in denying reformation.

There is a heavy burden on one who would seek reformation of a contract. As we said in Fritz v. Fritz, 94 Minn. 264, 266, 102 N. W. 705, 706 (1905):

"* * * Before a court of equity will interfere to reform a written instrument it must appear, substantially as alleged in the pleadings, that there was in fact a valid agreement sufficiently expressing in terms the real intention of the parties; that there was in fact a written contract which failed to express such

true intention; and that this failure was due to mutual mistake, or to mistake of one side and fraud or inequitable conduct of the other.* * * *These facts must be established by competent evidence, which is consistent and not contradictory, clear and not equivocal, convincing and not doubtful. Mere preponderance of testimony is not sufficient.* * * * Such relief will be extended to those only who have not by their own conduct (as laches, negligence, or otherwise) put themselves in such a position as to render it unjust to change the situation, especially when such change might injuriously affect the rights or status of innocent third parties." (Italics supplied.)

See, also, Cool v. Hubbard, 293 Minn. 349, 199 N. W. 2d 510 (1972); Metro Office Parks Co. v. Control Data Co. 295 Minn. 348, 205 N. W. 2d 121 (1973); Marso v. Mankato Clinic, Ltd. 278 Minn. 104, 153 N. W. 2d 281 (1967); Golden Valley Shopping Center, Inc. v. Super Valu Realty, 256 Minn. 324, 98 N. W. 2d 55 (1959). Furthermore, evidence on appeal will be viewed on appeal in the light most favorable to the prevailing party, and the trial court's factual findings will not be overturned unless clearly erroneous. Rule 52.01, Rules of Civil Procedure; Cool v. Hubbard, supra; Camenker v. Greene, 251 Minn. 106, 88 N. W. 2d 708 (1957).

Notwithstanding the above, we find sufficient reason for reversal in (1) uncontradicted evidence that John Theisen treated 1968 as the base year for over 3 years before any dispute arose; and (2) further uncontradicted expert testimony that the base year in this kind of commercial lease tax clause is the year in which taxes are assessed on the land and completed building.

While it is true that Theisen and his attorney were deceased at the time of trial, we think the most persuasive evidence of Theisen's intent is found in his own conduct. Theisen used 1968 as the base year in all billings to Red Owl after the execution of the lease, despite the contrary language of the tax clause. Counsel and the trial court would explain this conduct as inadvertence or carelessness, pointing to other minor mistakes in special as-

sessment billings. We think the consistency and duration of Theisen's conduct over some 3 years coupled with the small amounts of the special assessment errors render these inferences highly improbable. The standard for reformation does not require proof beyond a reasonable doubt, but clear and convincing evidence. Gartner v. Gartner, 246 Minn. 319, 74 N. W. 2d 809 (1956); Golden Valley Shopping Center, Inc. v. Super Valu Realty, *supra*. Whatever Theisen's billings may indicate about his understanding of the special assessment provision of the lease, they are clear and convincing evidence that he regarded 1968 as the base year.

The inference we draw from Theisen's conduct is further supported by the expert testimony of Robert Boblett on the concept of base year in commercial leases of this kind. While we recognize, as did Mr. Boblett, that individual leases may differ, we can see no reason for a tax clause that allocates real estate taxes based on increases in assessments over an assessment of *the land only*. Such a provision would be a totally unreliable measure of the tax burden as a cost of the lessor and would defeat the objective of such clauses—to ensure a reasonable return to the lessor by permitting a recovery of a major portion of any increase in the real estate tax burden on the land and improvements. To hold otherwise, we think, would uphold a commercial absurdity.

The two items of uncontradicted evidence we have discussed are clear and convincing evidence of Theisen's intent that the base year be 1968—the first year taxes were payable on the land and the store. The similar intent of Red Owl is so clearly established by the testimony of its representatives and their business records that it was assumed by the trial court and need not be discussed here. Since there is clear and convincing evidence of a mutual mistake of the parties, the lease must be reformed to indicate 1968 as the base year.

Reversed and remanded with directions to reform the lease consistent with this opinion.

YETKA, JUSTICE (dissenting).

I dissent. The senior Theisen is now deceased, as is his attorney who worked with him in negotiating the lease, so neither are here to testify. No great emphasis should be given to the fact that Theisen accepted 1968 as the base year for billings to Red Owl for several years prior to his death. It would be customary for him to follow the advice and counsel of Red Owl in sending his yearly billings. There is adequate evidence that experienced personnel in the Red Owl organization were well aware that Theisen's attorney had made the changes in the lease which made 1967 the base year, rather than 1968, for the purpose of determining the additional payments to be made by the lessee based on taxes and special assessments. That being so, it seems to me Red Owl had a duty to propose proper changes in the lease to reflect the parties' intent before it was executed, or, if it was simply oversight on the part of Red Owl, to make proper amendments to the lease within a reasonable period after its execution. It seems to me to wait several years after Theisen's death before Red Owl raised the issue should require us to invoke the doctrine of equitable estoppel against it.

Needless to say, I also believe Red Owl has not sustained its burden of proof because, as the majority opinion clearly states, there is a heavy burden on one who would seek reformation of a contract. Fritz v. Fritz, 94 Minn. 264, 102 N. W. 705 (1905).