Robert W. MILES, et al., Appellants,

v.

CITY OF OAKDALE, Respondent,

Steven A. Miller, et al., Respondents.

No. 81–153.

Supreme Court of Minnesota.

Aug. 20, 1982.

Rehearing Denied Oct. 22, 1982.

Doherty, Rumble & Butler and George L. May, St. Paul, for appellants.

Eckberg, Lammers, Briggs & Wolff and Paul A. Wolff, Stillwater, for City of Oakdale.

Blake & Phillips and Lorraine Blake, St. Paul, for Miller, et al.

YETKA, Justice.

This is an appeal from an order dated October 27, 1980, denying appellants' motion to amend the trial court's findings of fact, conclusions of law and order for judgment and from judgment entered on November 6, 1980. Appellants Robert and Kim Miles commenced this action against respondent City of Oakdale, seeking to enjoin the city from allowing water to flow onto the Mileses' property and for damages. Respondents Steven and Marcy Miller were also joined as defendants on the basis that they breached certain covenants contained in a warranty deed for the property that they sold to appellants. The case was tried before the court without a jury in Washington County District Court. Appellants brought this appeal following denial of their post-trial motions and after entry of judgment. We affirm the trial court in entering judgment for the Millers, but reverse and remand for a new trial against the City of Oakdale.

In the spring of 1976, Robert Miles arranged to purchase some residential property, described in part as Lot 18, Brochmann Acres, Washington County, from respondent Steven Miller. Miles inspected the lot, which was a part of an open tract of land and which was overgrown with weeds.

Miles did not notice at that time a 3-foot flume in the curb adjacent to the property through which surface drainage water was channeled into the south half of the lot. Miles subsequently entered into an earnest money contract with Miller.

Miles' attorney, upon examining title to the property, advised Miles not to close the sale until the Millers obtained permission from the respondent city to subdivide the lot; Miles was purchasing only the south half of Lot 18. On April 13, 1976, Miller appeared before the city council and received permission to subdivide the lot. Apparently problems concerning drainage of surface water onto the lot were mentioned at the meeting. Miller, however, apparently did not discuss this with Miles. The closing occurred on April 21, 1976, with Miles receiving a warranty deed. In July, the city issued a building permit for a house. Excavation began shortly thereafter. During construction, as required by the city code, Miles back-filled and raised the elevation of the house. At that time, Miles first noticed the flume. The flume was constructed in 1972 when the city paved and placed curbs along Gresham Avenue, on which the Mileses' house fronts.

Mileses' lot is located at a lower elevation than the surrounding property: the land to the east, north and south gradually slopes down towards the lot. The flume is located approximately 5 feet from the geographical low point of the area and at approximately the same elevation. Consequently, surface water from the surrounding area tends to flow through the flume located on Gresham Avenue and onto Miles' property.

Miles finished construction of, and moved into, his new home in April 1978. Erosion of the soil immediately adjacent to the flume had been noticed as early as the summer of 1977. By the time the Mileses moved into their home, a ditch had formed. The size of the ditch increased and, to alleviate the problem, the Mileses hired a backhoe operator in August of 1978. The backhoe operator straightened, but apparently did not either widen the ditch or cut a deeper furrow. At the time of the backhoe-

ing, the ditch was already approximately 2 feet deep. The backhoe operator also laid several 12-inch steel culvert sections and packed them in dirt in an attempt to carry the water to the rear of the lot. These actions did not succeed, however, and the ditch has become much wider and deeper. The city introduced evidence that the backhoeing might have been performed improperly and possibly may have accelerated the process of erosion.

In the fall of 1978, Miles contacted the city engineer about possible solutions to the problem. Subsequently, the city engineer prepared a feasibility study which recommended connecting the Mileses' property to an existing storm sewer on Stillwater Boulevard, 200 feet south of the area where water flows into the flume, for a projected total cost of $15,900. The city council rejected this proposal. The study was proposed to the city again by a new city engineer, Francis Burg, in September 1979. Burg testified that this project was the most feasible method of dealing with the problem. Nonetheless, this study also was rejected.

At trial, the evidence of the drainage pattern of water in the area of Miles' lot before the paving of Gresham and construction of the curb and flume was sharply disputed. Mary Paul, a neighbor of the Mileses, testified that, prior to 1972, water flowed down to a culvert made of old water heaters located under what is now Gresham Avenue. The culvert was located north of the flume and across from the north end of Mileses' lot. According to Paul's testimony, the water would flow through the culvert, under the road, and disperse in the north and back part of the Mileses' lot. Any excess water not flowing through the culvert would follow a ditch down Gresham and into a stream running parallel to Stillwater Avenue. Paul testified further that the city lowered the grade of Gresham and filled in the ditch through which the excess water flowed. The city engineer, however, testified that although the grade had been changed to a degree, it was essentially the same after construction. In the city engineer's opinion, the slight grade change did not change the general flow of water to the Mileses' lot. Apparently the hot water heaters serving as a culvert broke apart before construction. Paul testified, however, that the hole remained and continued to carry water until the city destroyed what was left of the culvert in 1972.

The city introduced testimony of the flow of water, based on analysis of topographical maps. The city's expert testified that, based on the land elevations indicated on the maps, the natural route of drainage would be through Miles' lot. He testified that the flume is located at the approximate geographical low point in the area and that, before 1972, water would flow in the same direction it does currently, i.e., through the point the flume is located. The expert also opined that, before 1972, water did not flow through a ditch alongside Gresham, as Paul had testified. These opinions, however, were not based on any personal observations of the area by the expert.

The appellants, however, impeached much of the expert's testimony. He admitted that, when grading, moisture-absorbing material was replaced by a granular material less able to absorb water. The expert also admitted that the topographical map did not show the location of the culvert or of the ditch. He testified that if the culvert had existed, water would flow as Paul testified. Although the flume is located at the geographical low point, the expert indicated that the elevation of the north of the lot—where water allegedly drained before 1972—was only 1.2 inches higher. Moreover, the expert testified that water would tend to spread over a flat surface if the flow of water were not concentrated. The expert could not tell from the maps whether, in the absence of the flume, water would flow in the same manner that it currently does, although it would flow to the same area. The expert did admit that if a ditch existed, as Paul had testified, water would have flowed down it to Stillwater Road.

The appellants introduced expert testimony that, but for the drainage problem, their property would be worth $62,000, but that

it is currently worth $32,000 and that the Mileses' damages are accordingly $30,000. This expert testified that if the problem is not cured, the Mileses' home will have to be moved. He also testified that it would be impractical for the Mileses to construct a culvert on their property: any culvert would only cause the water to drain onto the property of a neighbor. Moreover, if a culvert were constructed, a garage could not be built in that location as the Mileses had planned. The city, however, introduced evidence that the Mileses could remedy the situation by resodding and filling in the area with materials resistant to erosion. The Mileses also introduced general evidence that the ditch is an eyesore and dangerous. Upon the court finding that the actions of the city were not negligent and did not constitute a trespass or a nuisance, this appeal followed.

The issues raised on appeal are:

1. Whether the evidence was sufficient to support the trial court's findings of fact;

2. Whether the trial court erred in its conclusions of law by finding that the actions of the city, in constructing the drainage flume, were not negligent and did not result in a trespass or a nuisance; and

3. Whether the trial court erred by finding that respondents, the Millers, did not breach any covenants or warranties in connection with the sale of Lot 18 to the Mileses.

1. The general rule is that a trial court's findings of fact will not be reversed on appeal unless clearly erroneous. *Theisen's Inc. v. Red Owl Stores, Inc.*, 309 Minn. 60, 243 N.W.2d 145 (1976). We have defined a clearly erroneous finding variously to mean palpably and manifestly against the weight of the evidence or not reasonably supported by the evidence as a whole. *Enderson v. Kelehan*, 226 Minn. 163, 32 N.W.2d 286 (1948) (involving surface drainage rights); *Olson v. Blue Cross and Blue Shield*, 269 N.W.2d 697 (Minn.1978). This court, however, also has held that findings of fact may be reversed if the reviewing court has a definite and firm conviction that a mistake was made. *Desnick v. Mast*, 311 Minn. 356, 249 N.W.2d 878 (1976).

■ The trial court found, *inter alia*, that plaintiffs' lot is located at the lowest point in the immediate area across which surface water naturally flows; that the culvert through which certain water flowed collapsed prior to 1972; and that in constructing their house and backhoeing next to the flume, the Mileses removed erosion-resistant soil after which the ditch formed and the problem worsened. The court held that the city was not negligent in granting the Mileses a building permit, in curbing Gresham and constructing a drainage flume, and in not connecting the flume with the sewer located on Stillwater Avenue. Implicit in these findings is the conclusion the city did not substantially alter or divert the flow of surface water onto the Mileses' property and that the erosion and ditch substantially resulted from the actions of the Mileses.

We believe the findings and conclusions on this issue were clearly erroneous.

First, although the plaintiffs' own witness conceded that the water heaters in the culvert collapsed prior to the paving of Gresham, the witness also testified that the hole remained and that water continued to flow through it. This testimony was not contradicted by the city. The city also did not contradict testimony that water flowed southerly in a ditch down to Stillwater Avenue. Moreover, the trial court, in its findings, noted that water did flow through the culvert prior to its collapse. In addition, the flume, according to testimony of the city's own witness, is not located at, but approximately 5 feet from, the exact low point. The city's witness testified that the Mileses' property rises only 1.2 inches from the low point. Although testifying that the water would flow naturally to approximately the same location if there were no flume, the witness did not offer an opinion that the water would flow to exactly the same location, in exactly the same manner and at the same concentrated volume as it does currently. There was also evidence that

the city changed the road grade and removed water absorbent materials when it paved Gresham Avenue. Thus, any conclusion that there was no diversion of water from its pre-existing drainage pattern does not appear to be supported by the evidence as a whole.

2. This court, on reviewing decisions of trial courts, is not bound by determination of law made below. *See Lamb Plumbing and Heating Co. v. Kraus-Anderson of Minneapolis, Inc.*, 296 N.W.2d 859 (Minn.1980). In this regard, it appears that the trial court's interpretation of Minnesota law is inapplicable to the instant situation.

■ Minnesota has adopted "the rule of reasonable use and follows neither the rule of the common law nor that of the civil law. Sometimes it has been inaccurately referred to as merely a modification of the common-law rule, but obviously it has attained a distinct and independent status." *Enderson v. Kelehan*, 226 Minn. 163, 167, 32 N.W.2d 286, 289 (1948). In *Enderson*, the court further explained:

> [T]he rule is that in effecting a reasonable use for a legitimate purpose a landowner, acting in good faith, may drain his land of surface waters and cast them as a burden upon the land of another, although such drainage carries with it some waters which would otherwise have never gone that way * * * if
>
> (a) There is a reasonable necessity for such drainage;
>
> (b) If reasonable care be taken to avoid unnecessary injury to the land receiving the burden;
>
> (c) If the utility or benefit accruing to the land drained reasonably outweighs the gravity of the harm resulting to the land receiving the burden; and
>
> (d) If, where practicable, it is accomplished by reasonably improving and aiding the normal and natural system of drainage according to its reasonable carrying capacity, or if, in the absence of a practicable natural drain, a reasonable and feasible artificial drainage system is adopted.

*Id.* at 167–68, 32 N.W.2d at 289 (footnote omitted). Moreover, in determining reasonableness, a court should consider "such factors as the amount of harm caused, the foreseeability of the harm on the part of the possessor making the alteration in the flow, the purpose or motive with which he acted, and others." Kinyon & McClure, *Interferences With Surface Waters*, 24 Minn. L.Rev. 891, 904–05 (1940) (footnote omitted); *see Pell v. Nelson*, 294 Minn. 363, 201 N.W.2d 136 (1972). By contrast, the civil rule provides that "a person who interferes with the *natural* flow of surface waters so as to cause an invasion of another's interests in the use and enjoyment of his land is subject to liability to the other." Kinyon & McClure, *Interferences With Surface Waters*, 24 Minn.L.Rev. 891, 893 (1940) (footnote omitted) (emphasis in original). The "common enemy" or common-law rule provides that "a possessor of land has an unlimited and unrestricted legal privilege to deal with the surface water on his land as he pleases, regardless of the harm he may thereby cause to others." *Id.* at 898 (footnote omitted).

The trial court concluded that the city was not guilty of creating a trespass or a nuisance. The court's reasoning was based on the finding that the city did not divert any surface waters from their normal pathway or significantly increase the flow of water across the Mileses' project. In so concluding, the court applied the principles that the natural contours of the burdened property and the normal drainage pattern are factors to be considered; that the flow of water to burdened property generally may be increased without liability; and that a city is generally not liable for increasing the flow of surface waters to lower lying land pursuant to municipal improvements. *See Sheehan v. Flynn*, 59 Minn. 436, 61 N.W. 462 (1894); *Pell v. Nelson*, 294 Minn. 363, 201 N.W.2d 136 (1972); *Roche v. City of Minneapolis*, 223 Minn. 359, 27 N.W.2d 295 (1947).

■ These are general principles, however, whose application varies with the par-

ticular situation. In *Sheehan v. Flynn*, 59 Minn. 436, 61 N.W. 462 (1894), whether the burdened land was a natural depository for surface water drainage was but one factor in determining whether the action of increasing the flow of water was reasonable. Analytically, we believe that whether the natural flow of water has been altered is more properly connected with the question of causation: i.e., if the actions of the city did not alter the flow of surface water, their actions cannot be said to have caused any injury. In this context, assuming *arguendo* that the city did alter the flow of water, then in the instant situation, causation has been proved. Thus, the fact that the property held by the Mileses is the geographical low point and a natural depository for surface water drainage is only one of many relevant factors and not, as implied by the trial court and respondents, dispositive alone. *See Pell v. Nelson*, 294 Minn. 363, 201 N.W.2d 136 (1972). What is significant is that before Gresham Avenue was paved, some water flowed through a culvert north of the Mileses' property and some down a ditch to Stillwater Road. Rather than disperse over the north of the Mileses' lot, the water currently flows in a concentrated volume to one point.

The mere fact that the primary effect of the diversion of water by the city is only to increase or channel the flow of waters to the Mileses' property also is not conclusive. As noted by the trial court, most cases have not found liability for affecting the volume of water. We have limited, however, the ability of a landowner to accelerate and funnel the flow of water to a particular point. *Id.* at 368, 201 N.W.2d at 139.[1]

Here, rather than increase the volume of water, the actions of the city have resulted in the waters naturally flowing to the Mileses' property to become concentrated at the flume to a degree greater than before, resulting in the formation of a deep ditch.[2]

In this regard, we hold that the finding that the actions of the city were reasonable is erroneous and that the trial court did not sufficiently weigh the burden on Miles resulting from the city's actions. First, the city approved the lot for subdivision and approved the building permit for Miles. Uncontradicted evidence indicates that, upon approving the residential subdivision, the city was aware of the drainage problem with Lot 18. In addition, the city greatly contributed to the problem. While the court found that the Mileses accelerated the rate of erosion when they backfilled around the house during construction, the evidence also indicates such backfilling was required by city ordinance. The trial court also noted that the negligent backhoeing increased the erosion. Here, however, the evidence is uncontradicted that the ditch was already at least 2 feet deep before the backhoeing occurred.

■ Also significant is that, in rebuilding Gresham Avenue, the city apparently altered the street grade. Alteration of a street grade generally is an actionable matter for a landowner.[3] *E.g., Dickerman v. City of Duluth*, 88 Minn. 288, 92 N.W. 1119 (1903); *Austin v. Village of Tonka Bay*, 130 Minn. 359, 153 N.W. 738 (1915); *Maguire v. Village of Crosby*, 178 Minn. 144, 226 N.W. 398 (1929). The theory is based on the principle of eminent domain that in taking

---

1. In *Pell v. Nelson*, while the upper landowner was not liable for increasing the flow of water by use of ditches, the court affirmed the trial court, holding that the flow of water—in that case—could not be accelerated by mechanical means and funneled to a point selected by the upper landowner. In this regard, *Pell v. Nelson* is quite similar to the instant situation.

2. *Compare, Praught v. Bukosky*, 116 Minn. 206, 133 N.W. 564 (1911). There, the court held that the actions of defendant in merely accelerating the flow of water to a natural drainage basin was reasonable. This is distinguishable.

First, in that case, there was no finding of an unreasonable burden on plaintiff's property; second, there was no indication that water was channeled in a different manner.

3. Minn.Const. art. I, § 13 provides that "[p]rivate property shall not be taken, destroyed or damaged for public use without just compensation." This is not an action to compel an eminent domain proceeding, and the parties have not raised the issue of road grade change. Accordingly, we do not base our decision on this point.

or *damaging* private property pursuant to public improvements, the municipality must compensate the affected property owner accordingly. *See Electric Short Line Terminal Co. v. City of Minneapolis*, 242 Minn. 1, 64 N.W.2d 149 (1954); *Thomsen v. State*, 284 Minn. 468, 170 N.W.2d 575 (1969). We note this to emphasize that providing compensation where the burden resulting from diversion of surface waters is great is consistent with general principles of eminent domain. *See* Long & Long, *Surface Waters and the Civil Law Rule*, 23 Emory L.J. 1017, 1035 (1974).

Moreover, the burden on Miles far outweighs the benefit to the city. Neither party contests the benefit to the city and the public served by draining surface water and by constructing Gresham Avenue. It appears, however, that the trial court did not sufficiently consider the burden on the Mileses, except to note that the Mileses' property was a natural drainage area already. Although the city introduced evidence that the Mileses could remedy the problem by resodding the area, there was also evidence that water would, as a result, drain onto property adjacent to the Mileses, creating additional legal and drainage problems. The Mileses' only other solution is to move their house. In contrast, according to the feasibility study introduced at trial, the city could link a drain between the Mileses' property and an existing sewer located 200 feet away on Stillwater Avenue. This appears to be the only feasible solution and lies solely within the power of the city to use.

■ 3. It does not appear that the Millers breached any of the covenants contained in the warranty deed transferred to the Mileses. First, the covenant of warranty is a covenant relating to title. *See* 6A R. Powell & P. Rohan, The Law of Real Property ¶ 899 (1981). Second, *Harrington v. Bean*, 89 Me. 470, 36 A. 986 (1897) and *Smith v. Richards*, 155 Mass. 79, 28 N.E. 1132 (1891), cited by appellants, concerned perpetual and prescriptive easements of water drainage. In the instant situation, the alleged actions of the city constitute, at most, a trespass or a nuisance, and not a cloud on title, nor does the city have an easement over the Mileses' property.

■ Further, no breach of the covenant of quiet possession has occurred. That covenant does not apply to mere trespasses or actions of wrongdoing third parties, notwithstanding that it is a covenant of possession. Rather, the covenant applies to adverse claims. *See* 6A R. Powell & P. Rohan, The Law of Real Property ¶¶ 899–900 (1981). Here, although the city may be creating a trespass, it has not interfered with the Mileses' legal estate and its actions do not constitute an adverse claim or cloud on the Mileses' title. The rationale for the distinction is that the affected property owner has a damage action against the wrongdoer. *Id.* The Millers were aware only that water drained upon the Mileses' property.

Whether the plaintiffs could prevail against the Millers on some other theory of law for the Millers failing to disclose the defect in land is not before us because the plaintiffs proceeded only on the theory of breach of warranty and fraud. They are therefore bound by the law of the case. Judgment for the Millers must therefore be affirmed, judgment in favor of the city is reversed for the reasons aforesaid, and the case is remanded for a new trial against the City of Oakdale.

TODD, Justice (concurring specially).

I concur in the result.

SIMONETT, Justice (concurring specially).

I too concur in the result.

KELLEY, Justice (concurring specially).

I concur in the result.