**MINNESOTA VALLEY COUNTRY CLUB, INC., et al., Respondents,**

v.

**Mark R. GILL, Respondent,**

**Golf Shares, Inc., Respondent,**

**Charles Newman, Defendant,**

**First Lakeville State Bank, defendant, Appellant,**

and

**FIRST LAKEVILLE STATE BANK, Third-Party Plaintiff,**

v.

**Robert W. NAEGELI, et al., Third-Party Defendants.**

No. C1–84–95.

Court of Appeals of Minnesota.

Oct. 9, 1984.

Bruce D. Willis, Popham, Haik, Schnobrich, Kaufman & Doty, Ltd., Minneapolis, for Minnesota Valley Country Club, Inc., et al.

James R. Bresnahan, Stewart C. Loper, Cochrane & Bresnahan, P.A., St. Paul, for First Lakeville State Bank.

Considered and decided by POPOVICH, C.J. and WOZNIAK and RANDALL, JJ., with oral argument waived.

## OPINION

RANDALL, Judge.

Minnesota Valley Country Club, Inc. ("Minnesota Valley") brought this action against its president, Mark R. Gill; Golf Shares, Inc., a corporation wholly owned by Gill; Charles Newman, Gill's financial advisor; and First Lakeville State Bank ("Lakeville Bank") alleging that Gill, in conspiracy with the others, had converted substantial corporate assets to his own use. At the same time, Lakeville Bank brought suit against Golf Shares and Gill on a promissory note in default and against Minnesota Valley on a purported pledge of its assets by Gill as security for the promissory note. The actions were consolidated for trial. Newman was dismissed from the action before trial. After a nine-day trial before the court, judgment was entered in favor of Minnesota Valley against all re-

maining defendants, and Lakeville Bank appealed. We affirm.

## FACTS

During the latter half of 1975, Mark Gill began negotiating to buy a majority of the stock of Minnesota Valley, which operated a private golf club in Bloomington, Minnesota. Golf Shares was incorporated solely for the purpose of acquiring a majority interest in the outstanding stock of Minnesota Valley. Gill was its sole shareholder. Gill used Golf Shares as a conduit or alter ego for his own affairs; few, if any, corporate formalities were observed.

In April 1976, Gill completed negotiations for Golf Shares's acquisition of three blocks of Minnesota Valley stock, which together represented about 51% of the outstanding stock. He was represented by attorney Robert Ahl, who also represented Lakeville Bank and who was a director and shareholder of Lakeville Bank. Lakeville Bank agreed to lend Gill or Golf Shares $100,000 in order to make the down payments on the first two blocks. (Because the third block of stock was purchased from an estate, the down payment was delayed.) As security for this loan, Gill pledged assets belonging to Minnesota Valley even though the purchase agreements for the stock in question prohibited pledging Minnesota Valley's assets for such purpose.

After the execution of the purchase agreements, Gill and his wife became two of the three directors of Minnesota Valley. Shortly thereafter, the third director resigned, and Gill and his wife elected Gill president of Minnesota Valley. Gill then pledged savings certificates belonging to Minnesota Valley as collateral for the loan to Golf Shares, and executed a guaranty of Minnesota Valley for the loan to Golf Shares and a personal guaranty of the loan to Golf Shares. Gill had no authority to make such pledges at that time.

In August 1976, Gill attempted to borrow money from Lakeville Bank for the down payment on the third block of stock. The bank agreed to lend the money on the condition that Gill pay a $5,000 cash "fee" to the bank's president. Gill agreed and, as president of Golf Shares, signed a $46,-000.00 note, paying $5000 of it to the bank president, who split it with attorney Ahl. This note was also secured by Minnesota Valley's guaranty, Gill's personal guaranty, and a pledge of Minnesota Valley's accounts receivable.

At the end of December 1976, William Hibbard, vice president and general manager of Minnesota Valley and one of the selling shareholders, learned of the pledges. Shortly thereafter he confronted the president of Lakeville Bank, telling him the pledges were in violation of the stock purchase agreements. Despite this, the $46,000.00 note was renewed, with Minnesota Valley accounts receivable pledged as security. In addition, Golf Shares borrowed another $7,000 from the bank, also secured by a guaranty of Minnesota Valley executed by Gill. This note was paid down to $6,600 and renewed on April 11, 1977.

On March 22, 1977, Lakeville Bank changed the outstanding $46,000.00 loan to Golf Shares (Gill's corporation) to a direct obligation of Minnesota Valley. Gill signed a promissory note as president of Minnesota Valley which substituted golf carts belonging to Minnesota Valley for its accounts receivable as collateral for the loan. The loan comment sheet prepared by bank president Murphy indicated that the loan was a "renewal," although there had been no previous borrowing by Minnesota Valley.

At the April 25, 1977, Minnesota Valley shareholders' annual meeting, Gill represented that all outstanding pledges and guaranties by Minnesota Valley of Golf Shares loans would be released in ten days. Further, Gill, as president of Minnesota Valley, obtained a mortgage commitment for a loan to Minnesota Valley from First Federal Savings which was contingent upon pledges and guaranties of Minnesota Valley for the loans of others being released and satisfied. In order to release the pledges, Lakeville Bank's attorney, its president, attorney Ahl and Newman all

convinced Gill to redeem Minnesota Valley's savings certificates and use the proceeds to pay off Golf Shares's original $100,000 loan.

At a meeting in Ahl's office on June 2, 1977, which Gill, Newman, and Ahl attended, the redemption of Minnesota Valley's savings certificates was planned. Lakeville Bank president Murphy authorized Ahl to represent the bank at the meeting. Notes of the meeting taken by Newman indicated that an investment in Golf Shares by Murphy, Ahl, and others was proposed in an amount sufficient to replace Minnesota Valley's savings certificates. On June 14, 1977, Gill and Newman met with Murphy at Lakeville Bank. In a series of unified transactions, all occurring in Murphy's office and in his presence, Gill endorsed a cashier's check payable to Minnesota Valley in the amount of $105,694.69, representing the redemption value of the savings certificates; gave Murphy that check and an additional $9,600, along with a $115,294.69 Golf Shares deposit slip; and gave Murphy Golf Shares checks in the amounts of $102,144.53 and $6,694.05 to pay off the outstanding notes of Golf Shares. The money represented by the redeemed savings certificates was never repaid to Minnesota Valley.

When Gill and Newman had arrived at Murphy's office, Murphy had everything ready for the redemption and payment, except that the cashier's check for redemption of the certificates was payable to the bank and had to be rewritten to be payable to Minnesota Valley. The bank then provided a cover letter for the First Federal mortgage closing stating that the assets of Minnesota Valley that had been pledged as collateral had been released. The letter did not say, however, that the assets (the certificates of deposit) were no longer in existence.

## ISSUES

I. Was the evidence sufficient to support the trial court's finding that Lakeville Bank conspired to convert and did convert property belonging to Minnesota Valley?

II. Was the evidence sufficient to support the trial court's finding that Lakeville Bank was liable to Minnesota Valley pursuant to the provisions of the Uniform Fiduciaries Act, Minn.Stat. §§ 520.08 and 520.09?

III. Did the trial court err in finding that the purported pledge of assets belonging to Minnesota Valley to Lakeville Bank was unenforceable?

IV. Did the trial court err in awarding punitive damages against Lakeville Bank?

## ANALYSIS

The trial court's findings of fact may not be set aside unless they are clearly erroneous, meaning manifestly contrary to the weight of the evidence or not reasonably supported by the evidence as a whole. Rule 52.01, Minn.R.Civ.P.; *Northern States Power Co. v. Lyon Food Products, Inc.*, 304 Minn. 196, 229 N.W.2d 521 (1975). On review, we must view the evidence in the light most favorable to the trial court's decision. *Theisen's, Inc. v. Red Owl Stores, Inc.*, 309 Minn. 60, 243 N.W.2d 145 (1976). The burden is on the appellant to show there is no substantial evidence reasonably tending to sustain the trial court's findings.

### I. Conspiracy and Conversion

In order to show that Lakeville Bank converted assets of Minnesota Valley, Minnesota Valley must show that the savings certificates pledged as security for the loan to Golf Shares were the property of Minnesota Valley, that Minnesota Valley did not consent to their use or taking, and that, as a result of the joint actions of Gill and the bank, Minnesota Valley was deprived of the certificates either permanently or for an indefinite period of time. *Hildegarde, Inc. v. Wright*, 244 Minn. 410, 70 N.W.2d 257 (1955). The only element seriously disputed by Lakeville Bank is the element of non-consent. The bank argues that, first, Gill, as president of Minnesota Valley, consented on behalf of Minnesota Valley to the use of the certificates; second, even if Gill did not have authority to

consent, the bank justifiably relied upon the advice of counsel that he did have authority; and, third, the acts which constituted the conversion were the acts of bank president Murphy only and may not be imputed to the bank. We disagree.

*1. Gill's lack of authority:* Lakeville Bank alleges that, in pledging assets of Minnesota Valley to secure the loan made to purchase Minnesota Valley stock, Gill was only engaging in a "leveraged business transaction" which is one used every day in sophisticated corporate acquisitions. What Gill pledged as security for the loan, however, was not the stock itself; the stock was already encumbered, since it was the security for the stock purchase agreements. The security pledged was assets of the target company (the corporation to be acquired), not the stock being purchased, a fact which both the bank's attorney, Ahl, and the bank's president, Murphy, knew. While it is true that the Minnesota Business Corporations Act grants corporations the power to encumber assets, it also provides that "[n]o corporation shall lend any of its assets to any officer or director of the corporation * * * " Minn.Stat. § 301.32 (1978).

■■■ A pledge of assets clearly constitutes a loan of assets for purposes of this section. Gill had no authority to pledge the assets of Minnesota Valley to secure a loan to himself or to his wholly-owned corporation for the purpose of buying Minnesota Valley.

■ *2. Advice of counsel:* Lakeville Bank alleges it justifiably relied upon the advice of its director and attorney, through its president, that the pledge of Minnesota Valley's assets to secure the loans to Golf Shares was proper. The trial court found that any reliance upon such advice was *not* justified in light of the bank president's knowledge of the transactions, his acceptance of a kickback for one loan, and his attempt to cover up the transactions involved in this litigation. This finding is supported by the evidence. Gill's previous attorney had advised him it would be illegal to pledge assets of Minnesota Valley to secure the loans used to purchase Minnesota Valley stock, and both Ahl and Murphy knew of that advice. Murphy's knowledge of the impropriety or illegality of many of the transactions is further demonstrated by his attempts to cover up the true nature or purpose of them by, for example, giving false reasons for loans on loan comment sheets.

■ *3. Acts of bank president imputed to bank:* Lakeville Bank argues that the trial court "applied a double standard" in imputing knowledge and acts of Murphy and Ahl to the bank while refusing to impute knowledge and acts of Gill to Minnesota Valley. The difference, however, is important: While purporting to be acting on behalf of Minnesota Valley in pledging assets, Gill was actually working for his own personal gain and for the gain of his wholly-owned corporation, Golf Shares. Minnesota Valley stood to gain no benefit from Gill's attempt to pledge its assets. Murphy, however, demonstrated that he was acting on behalf of the bank in that his misdeeds were undertaken in the course and scope of his employment with the bank—that is, arranging and making loans. *See Brooks Upholstering Co. v. Aetna Insurance Co.,* 276 Minn. 257, 149 N.W.2d 502, 506 (1967) (officer's knowledge imputable to corporation if officer was acting within scope of his duties). The trial court did not err in finding the bank liable for acts of Murphy and for attributing to the bank knowledge possessed by Murphy and Ahl.

## II. Liability Under Uniform Fiduciaries Act

The trial court found Lakeville Bank liable to Minnesota Valley under two sections of the Uniform Fiduciaries Act, Minn.Stat. §§ 520.08 and 520.09. Section 520.08 imposes liability upon a bank for checks drawn by a fiduciary upon the account of his principal if the bank

> pays the check with actual knowledge that the fiduciary is committing a breach of his obligation as fiduciary in drawing

such check, or with knowledge of such facts that its action in paying the check amounts to bad faith. If such a check is payable to the drawee bank and is delivered to it in payment of or as security for a personal debt of the fiduciary to it, the bank is liable to the principal if the fiduciary in fact commits a breach of his obligation as fiduciary in drawing or delivering the check * * *

regardless of the knowledge of the bank. Section 520.09 imposes liability upon a bank for checks payable to a principal and endorsed by a fiduciary if the bank "pays the check with actual knowledge that the fiduciary is committing a breach of his obligation as fiduciary * * * or with knowledge of such facts that its action in * * * paying the check amounts to bad faith."

Gill, as president and a director of Minnesota Valley, was a fiduciary of Minnesota Valley. Minn.Stat. § 520.01, subd. 3 (1976). Minnesota Valley's savings certificates were reduced to a cashier's check payable directly to Lakeville Bank. Realizing such a check might cause problems, bank president Murphy had a second check prepared, payable to Minnesota Valley. Gill endorsed that check and used the proceeds to pay off a debt to Lakeville Bank which was personal to him and to his wholly-owned corporation, Golf Shares, (which, the evidence shows, was nothing more than Gill's alter ego or conduit). Thus, even were there no evidence of bad faith on the part of the bank, the bank could be liable under Minn.Stat. § 520.08. However, since Murphy and Ahl, representing the bank, knew that Gill's use of the money was a breach of his duty to Minnesota Valley (since Minnesota Valley's purported pledge of the certificates was invalid), there was strong evidence of bad faith to sustain liability under either standard of Minn.Stat. §§ 520.08 and 520.09. The actual format of the transactions which occurred in Murphy's office is not as important as their substance, which was conduct that the provisions in sections 520.08 and 520.09 were intended to prevent.

### III. Unenforceability of Pledge

The trial court dismissed Lakeville Bank's counterclaim against Minnesota Valley seeking to enforce Minnesota Valley's purported pledge against the $46,-000.00 loan to Golf Shares, which is in default. Lakeville Bank now argues that if the guarantee and pledge agreements were unauthorized at the time they were made, then the consideration for the $46,000.00 loan fails, and the loan itself was unauthorized. Neither Minnesota Valley nor this court disagrees with that statement. However, Lakeville Bank's self-serving participation in Gill's actions is not a legal argument that leads to a recovery under the pledge agreement by Lakeville Bank. The bank had notice that Gill intended the money for a non-corporate purpose and that the pledge of Minnesota Valley assets was improper. In a similar situation, the Minnesota Supreme Court stated:

[I]f it appears that money is borrowed, not for a corporate purpose, but for the private use of the officer of the corporation to whom it is paid and with intent on his part to divert it to such private use, and that the lender knows or is chargeable with knowledge of that fact, then the transaction, so far as the corporation is concerned, is a nullity.

*Gross Iron Ore Co. v. Paulle,* 132 Minn. 160, 165, 156 N.W. 268, 270 (1916), *aff'd on remand,* 143 Minn. 48, 172 N.W. 907 (1919). The pledge of Minnesota Valley assets to secure the loan to Gill/Golf Shares is unenforceable.

### IV. Punitive Damages

The trial judge assessed punitive damages in the amount of $30,000 jointly and severally against Gill, Golf Shares, and the Lakeville Bank. Lakeville Bank contends the assessment of punitive damages against it was unwarranted, since, it claims, "the only basis for relief [granted against the bank] is the Uniform Fiduciaries Act." Since the Uniform Fiduciaries Act is a statute governing a contractual relationship, the bank reasons, and since "the general rule concerning punitive damages * * * is that exemplary damages are

recoverable only in actions *ex delicto,* * * * the only liability of the bank is for single damages." Appellant's brief at 30. This argument is a misstatement of the trial court's findings. The trial court found the bank liable for conspiracy to convert and conversion of assets belonging to Minnesota Valley as well as under the Uniform Fiduciaries Act. Punitive damages are recoverable in a conversion action where the conversion is willful or accomplished with reckless disregard for the rights of others. Minn.Stat. § 549.20 (1982); *Huebsch v. Larson,* 291 Minn. 361, 191 N.W.2d 433 (1971).

The record in this case supports the trial court's finding that Lakeville Bank as well as Gill acted with reckless disregard for the rights of Minnesota Valley. To further its own business advantage, the bank allowed Gill to use the assets of Minnesota Valley as though they were his own personal assets. The bank used Minnesota Valley's assets whenever it wanted security for its loans to Gill or Golf Shares, to the extent at one point of simply rewriting a debt of Golf Shares into a debt of Minnesota Valley. Lakeville Bank's conduct throughout its dealings with Gill supported the court's award of punitive damages.

## DECISION

The trial court did not err in finding Lakeville Bank liable to Minnesota Valley for conversion and under the Uniform Fiduciaries Act. The trial court properly refused to enforce the purported pledge of Minnesota Valley assets to secure a loan, and did not err in assessing punitive damages against the bank.

Affirmed.