ANDREW EDWARD ABRAMSON AND ANOTHER v. JOEL H. NELSON AND ANOTHER.
DOUGLAS REES AND OTHERS, THIRD-PARTY DEFENDANTS.

116 N. W. (2d) 405.

July 27, 1962—No. 38,626.

*Meagher, Geer, Markham & Anderson, O. C. Adamson II,* and *Mary Jeanne Coyne,* for appellants.

*Lindquist, Fraser & Magnuson* and *Richard E. Kossow,* for respondents Abramson.

*Faegre & Benson* and *Loring M. Staples,* for respondents Rees.

*Dorsey, Owen, Marquart, Windhorst & West* and *Arthur E. Weisberg,* for respondent Rees-Thomson-Scroggins, Inc.

*Mahoney & Mahoney* and *Maloney, Carroll & Olson,* for respondent Egan, Field & Nowak, Incorporated.

KNUTSON, CHIEF JUSTICE.

This is an appeal from a judgment entered pursuant to findings of fact, conclusions of law, and order for judgment after a trial by the court without a jury.

The case arises out of conveyances of adjacent tracts of land by a common grantor to plaintiffs, Andrew Edward Abramson and Mary Ellen Abramson, and defendants, Joel H. Nelson and Marian B. Nelson. The action originally was brought by plaintiffs to compel defendants to remove a house they had built which encroached upon the tract of land deeded to plaintiffs. Defendants answered this complaint and filed a third-party complaint seeking reformation of the deed under which they had purchased their lots, bringing in as third-party defendants the grantors of the land, Douglas Rees and Maxine V. Rees; the agent for the sale of the land, Rees-Thomson-Scroggins, Inc.; and certain surveyors who had surveyed the land, Egan, Field

& Nowak, Inc. The court found in plaintiffs' favor and ordered defendants Nelson to remove their house from plaintiffs' land and to restore plaintiffs' lot to its original condition but awarded only nominal damages for trespass upon plaintiffs' property. Findings were made in favor of the third-party defendants. Defendants Nelson have appealed from the judgment. None of the other parties has appealed, so the only question before us is the sufficiency of the evidence to sustain the court's findings of fact and the sufficiency of the findings of fact to sustain the conclusions of law.

The evidence is in irreconcilable conflict. It is elementary that we must now view the evidence in the light most favorable to the prevailing party and that if there is reasonable support to be found for the findings of fact they must stand. In so doing, the court could find the following facts.

The property involved in this case was originally acquired by Douglas Rees and a partner named Dolan in about 1948. It is described as "quite rolling and very wooded and heavily underbrushed," located on Hardscrabble Point on Lake Minnetonka. The partners subsequently split up, Rees retaining the land here involved. Originally he had a tract 320 feet on the side fronting Lake Minnetonka and somewhat narrower on the opposite side, which adjoined a road or driveway. In 1957, he sold a tract which had about 100 feet fronting on Lake Minnetonka and some 50 odd feet fronting on the road to one Mueheler. The land was surveyed at that time, and the corners of the Mueheler lot marked.

Prior to 1952, Rees was the principal owner and manager of Rees-Thomson-Scroggins, Inc., a realty firm, but at the time here involved he had given up management and control of that company, and the company had a nonexclusive listing of the property which Rees owned and which is involved here. In 1957, the Nelsons were shown a part of this property by one Peters, who worked for Rees-Thomson-Scroggins, Inc. Much of the difficulty in this case arises from the contacts between Peters and the Nelsons. The Nelsons contend that Peters showed them the land which they now seek to acquire by reformation of their deed. Peters, on the other hand, contends, and the record bears him out, that he cautioned the Nelsons that the land was rough

and that the lines were not well-defined and that it would be important to have the land surveyed before the deal was completed.

On December 18, 1957, Joel H. Nelson and Peters, acting as agent for Rees-Thomson-Scroggins, Inc., entered into a purchase agreement for a part of a tract of land approximately 100 feet of which fronted on the lake and 55 feet of which abutted on the road. Peters testified that he had a conversation with Nelson prior to the execution of this agreement. His testimony is:

"We were standing on the back edge of the property near the road, and I asked Mr. Nelson if this is the property that you are interested in buying, and referred to the plat which I had which showed the lot that he indicated that he was interested in. This was the southerly-most lot owned by Mr. Rees at that time, according to my understanding of the lot, and I also pointed out to him—I said, 'You will notice that this lot is facing in an easterly direction,' and he noted this, and he said, 'This is the lot I want to make an offer on.' "

Peters testified that he then cautioned Nelson about the exact location of the lot. In that regard he testified:

"I said, 'Joel and Marian, inasmuch as this property is raw land, and we cannot find any stakes out there to designate where the property is, I have shown you a general area. This is approximately where your lot is. I think it's real important for your protection as well as the protection of the seller, that we insert this clause. This will give you a survey of the property and you will know exactly were your lot is.' "

It is admitted that prior to execution of the contract the following words were inserted in writing: "Seller to stake lot front and rear."

Thereafter the property was surveyed by Egan, Field & Nowak, Inc., and the corners were marked by iron pipes. Laths with red ribbons attached to them were placed at the location of these pipes. There is some dispute in the evidence as to whether the crucial corner of the lot deeded to defendants Nelson was so marked, but the court could find, as it did, that all four corners were adequately marked.

Prior to the making of the survey the Nelsons, with their builder, went onto the land and determined where they wished to build the

house. The lot was properly described in the deed and purchase agreement, but it is apparent that the Nelsons and the builder, in attempting to locate their lot, made a mistake in assuming that the east corner of the lot adjacent to it to the north was the corner of their lot. Their own surveyor, Harvey A. Cartwright, testified on cross-examination:

"Q.   Well, who told you to select this northeasterly corner of the Abramson's lot or why did you select it?

"A.   Well, it was apparent that they had crossed corners at the lake.

"Q.   They what?

"A.   They had crossed corners at the lake; in other words, they used the proper corners in the front, on the rear, on the street, and they swapped corners in the back."

Upon further cross-examination he testified:

"Q.   Did you double check these against the Egan, Field and Nowak surveys?

"A.   Yes.

"Q.   And did you find that the Egan, Field and Nowak surveys were correct?

"A.   Yes.

"Q.   And did you find that the irons that were indicated on the Egan, Field and Nowak surveys were in fact in place according to the investigation made by your man?

"A.   Yes.

"Q.   And in all respects, the Egan, Field and Nowak surveys were proper, is that correct?

"A.   Yes.

"Q.   And it was your conclusion after looking at this whole thing that what had happened is that they had switched from the road stakes to the lake stakes, is that correct?

"A.   The road stakes were still in the proper location that they should be, and they had swapped the back stakes.

"Q.   Out on the lake?

"A.   Out on the lake, yes.

"Q. In other words, they moved over to the next lot going from the road to the lake?

"A. That's the way it appears to us."

After the Nelson house had been partly constructed, plaintiffs went onto the land with Peters, seeking to purchase the lot north of the Nelson property. Again the approximate location of the land was pointed out, and they assumed that the Nelson house was being constructed on the land described in the Nelsons' deed. The Abramsons decided to buy the remaining lot owned by Rees, which was approximately the same width on both ends as the lot which had been sold to the Nelsons. A deed was executed properly describing the remaining lot, but when Abramson went onto the land to build he found that something was wrong, and, upon having a resurvey made, it was discovered that the Nelsons had built on part of the lot which had been sold to the Abramsons. As a matter of fact, the Nelsons' lot, as they seek to have the deed reformed, would cut diagonally across the two lots, leaving a triangular piece on the north with no access to the lake and a triangular piece on the south side with no access to the road. For all practical purposes, both parcels so left would be worthless. The surveyor hired to stake the Abramson house on June 5, 1959, found all the irons marking the Abramson lot and all but one of those marking the Nelson lot. Some grading had been done on that lot and apparently one of the corner posts had been destroyed.

It is the claim of the Nelsons that there was a mutual mistake and that the deeds should be reformed. That there was a mistake in locating their house can hardly be disputed.

■ The rule respecting the evidence essential to a reformation of a contract is well stated in Fritz v. Fritz, 94 Minn. 264, 266, 102 N. W. 705, 706, where we said:

"* * * (a) Before a court of equity will interfere to reform a written instrument it must appear, substantially as alleged in the pleadings, that there was in fact a valid agreement sufficiently expressing in terms the real intention of the parties; that there was in fact a written contract which failed to express such true intention; and that this failure was due to mutual mistake, or to mistake of one side and fraud or

inequitable conduct of the other. (b) These facts must be established by competent evidence, which is consistent and not contradictory, clear and not equivocal, convincing and not doubtful. Mere preponderance of testimony is not sufficient. (c) Such relief will be extended to those only who have not by their own conduct (as laches, negligence, or otherwise) put themselves in such a position as to render it unjust to change the situation, especially when such change might injuriously affect the rights or status of innocent third parties."

That rule may be qualified where a unilateral mistake is coupled with fraud or inequitable conduct or concealment of known facts by the party unmistaken. In Farmers' Store v. Delaware Farmers' Mutual Fire Ins. Co. 240 Minn. 170, 174, 59 N. W. (2d) 889, 892, we said:

"Where the right of reformation is predicated upon mutual mistake and there is no evidence of fraud or inequitable conduct, the evidence to justify reformation must be clear, precise, and convincing. * * * It must establish that the instrument sought to be reformed fails to embody the actual agreement between the parties and that the failure in this respect was due to the mutual mistake of the parties rather than the unilateral mistake of one party."[1]

■ The evidence in this case clearly fails to meet the requirements for procuring a reformation of a contract. While it is obvious to everyone that a costly mistake was made in locating the Nelson house partly upon property they did not own, the court could find from the evidence that the mistake was not attributable to anything done by Rees or his agent or the surveyors who properly surveyed the property. It seems quite clear that the mistake occurred when the Nelsons mistakenly assumed that the northeast corner of the Abramson lot was the northeast corner of their lot, and, while there is some evidence that when Peters and Nelson were on the land the exact property finally purchased was not accurately pointed out, it is equally evident that the Nelsons were warned that the lines were not known at that time and that they would have to depend upon a survey. The survey was

---

[1]See, also, Glaser v. Alexander, 247 Minn. 130, 76 N. W. (2d) 682; Olson v. Shephard, 165 Minn. 433, 206 N. W. 711.

correctly made, and, if they had taken more pains to ascertain where their lines were, the error in all probability would have been avoided. Certainly nothing done by Abramson has brought about the mistake, and the evidence amply sustains the court's finding that the mistake was attributable solely to the Nelsons and their builder. Under these circumstances, there is nothing we can do but hold that the court's findings are sustained by the evidence.

Affirmed.