Lowell **WAKEFIELD,** Appellant,

v.

**ANCHOR BANCORP, INC.,** et al., **Respondents,**

**McLeod Bancshares, Inc.,** Appellant.

No. C9–87–1428.

Court of Appeals of Minnesota.

Dec. 15, 1987.

Thomas A. Foster, Foster, Waldeck & Lind, Minneapolis, for Lowell Wakefield.

Thomas W. Tinkham, Thomas M. Kelly, Kelly & Jacobson, Minneapolis, for Anchor Bancorp, Inc., et al.

John L. Devney, St. Paul, for McLeod Bancshares, Inc.

Heard, considered, and decided by PARKER, NIERENGARTEN and RANDALL, JJ.

## OPINION

RANDALL, Judge.

Appellant Lowell Wakefield (Wakefield) sued respondents Anchor Bancorp, Inc. (Anchor), Exchange State Bank (Exchange), Winton Jones (Jones) and appellant McLeod Bancshares (McLeod) to dissolve Anchor, Exchange and McLeod, following a business dispute between Jones and Wakefield. After suit was filed, Wakefield acquired a majority interest in McLeod, and dismissed his claim against it. Jones cross-claimed for dissolution of McLeod. A few months later, McLeod's board of directors approved two transactions involving exchange of cash for stock and stock for stock. These transactions gave Wakefield control of McLeod. Some months after this transaction, the trial court granted Jones' motion for a temporary injunction to restrain the sale and the exchange, and it subsequently clarified the injunction. Wakefield and McLeod appeal from the clarifying order. We vacate the temporary injunction and remand.

## FACTS

In 1980, appellant Wakefield (Wakefield will be referred to as appellant, and McLeod will be referred to by name, or the two collectively will be referred to as appellants) and respondent Jones (each respondent will be referred to by name or collectively as respondents) entered into a business venture and formed Anchor Bancorp, with Jones as the majority shareholder and appellant as a minority shareholder.

Anchor, a holding company, owns all of the stock of both First National Bank of Wayzata and First Bank Minnesota, West St. Paul. Anchor also owns a majority of shares in Exchange State Bank of St. Paul, acquired by Jones and appellant in 1980. Appellant is a minority shareholder in Exchange. In 1980, appellant and Jones formed a second holding company, McLeod Bancshares. Appellant, Jones and Calvin Johnson were the sole shareholders of McLeod when this suit was commenced. Appellant and Jones then each owned approximately 41% and Johnson owned approximately 18%.

McLeod owns controlling interests in First National Bank of Glencoe and First Bank of Minnesota's Stewart and Hutchinson branch banks. Appellant was employed by a number of Anchor and McLeod banks, including the First National of Wayzata, either as an officer or a director.

In 1985, appellant and Jones' business relationship deteriorated after a dispute. As a result, appellant alleged in his complaint, Jones used his influence to "force" appellant to resign as director and officer of First National Bank of Wayzata and from Anchor and Exchange, and to terminate appellant's line of credit at First National Bank of St. Paul. Jones alleged appellant was not forced to resign, but resigned voluntarily.

On January 8, 1986, appellant sued Jones, Anchor, Exchange and McLeod, under Minn.Stat. § 302A.751 (1984), to dissolve Anchor, Exchange and McLeod, and appoint a receiver to liquidate the corporations; alleging $300,000 in damages for breach of contract; and seeking recovery for interference with the contract, outrageous conduct, and punitive damages. Jones, et al,. cross-claimed for dissolution of McLeod. Later, appellant purchased Johnson's McLeod shares, acquiring a majority interest in McLeod. On April 30, 1986, appellant dismissed his claim for dissolution of McLeod. According to an affidavit filed by appellant, Jones resigned his position as a director of McLeod on April 8, 1986.

On November 20, 1986, McLeod's board of directors approved two transactions: (1) the purchase from appellant of 1100 shares of Anchor stock for $330,000. Appellant delivered the Anchor stock to McLeod and received the $330,000 from Anchor. He applied to the Federal Reserve Board for approval of this sale. Anchor, however, refused to register the stock in McLeod's name. This transaction is at issue on appeal. (2) McLeod issued 1464 shares of its

stock for 490 shares of Exchange stock owned by appellant. This transaction is not at issue on appeal.

On March 9, 1987, Anchor, Exchange and Jones moved for a temporary injunction after McLeod unsuccessfully attempted to register its purchase of appellant's stock in Anchor. Anchor refused to register the transaction and respondents sought the temporary injunction in issue. Jones alleged the transactions would financially harm McLeod's subsidiary banks, and Jones provided supporting affidavits. The court granted Jones' motion for a temporary injunction, nullified the transaction, and required Jones to post a $600,000 bond.

Although the trial court issued the injunction, appellant continued to hold the $330,000 stock price, and McLeod kept appellant's Anchor stock. Jones, Exchange and Anchor then moved the court to hold appellant in contempt or, in the alternative, to clarify the injunction. The court refused to hold appellant in contempt, but clarified its prior order by requiring appellant to return the $330,000 to McLeod. The trial court made no findings in either order. Appellant and McLeod appeal from the modification of the original injunction.

In support of their motion for a temporary injunction, respondents supplied the court with certain affidavits. Randal D. Miller, a certified public accountant, submitted one of the affidavits. In the past, he prepared procedures examinations for Exchange and for McLeod's three subsidiary banks. In preparation for his affidavit, he reviewed McLeod's financial statements through December 31, 1985, and financial statements of McLeod and its subsidiary banks, as well as McLeod's application to the Federal Reserve Bank for approval of the exchange of McLeod for Exchange stock.

Based on the information available to him, Miller calculated the book value of McLeod stock at $502.34 per share as of December 31, 1986, based on stockholders' equity of $1,809,934.21. He calculated, in an undisclosed way, the book value of Exchange at $614.62 as of December 31, 1986, and found the value of appellant's 490 shares of Exchange to be $301,163.80. He assumed that book value was representative of market value of both entities. He concluded, based on these assumptions, that the book value of appellant's 490 Exchange shares equaled 14% of "the new pro forma book value of McLeod;" and that the proposed exchange would overvalue the Exchange stock appellant was selling McLeod, as well as dilute the value of McLeod stock held by Jones.

Jones, in his affidavit stated:

2) The proposed transaction between McLeod and Wakefield * * * will severely and irreparably injure the First Bank of Minnesota * * *. Hutchinson, which is 100% owned by McLeod, is presently undercapitalized. Its financial support comes from its sole shareholder, McLeod. If McLeod gives up $330,000 in cash, it will not be able to provide significant additional capital to Hutchinson. It requires the $330,000 capital being extracted by Wakefield for its stability and continued operation.

3) The proposed transaction between McLeod and Wakefield would serve to inure to the sole benefit of Wakefield, allowing him to divert much needed cash for his own personal use, at the expense of McLeod generally, and Hutchinson, more specifically. The proposed transaction will clearly and irreparably harm my interests as a minority shareholder in McLeod and Hutchinson.

Karen Knafla, a vice president of Anchor and a former examiner for the Federal Reserve, reviewed McLeod's past financial records and noted that in the past it "appears that * * * substantial outside additions to capital in 1984 and 1985 and a smaller addition in 1986" were made to the Stewart and Hutchinson subsidiaries of McLeod. She concluded,

Based on these figures, it is my opinion that there is a strong likelihood that there will be an additional need for capital at Stewart (and) Hutchinson in the near future.

Wakefield submitted counteraffidavits. Thomas Benshop is a CPA who has done audits and tax work for McLeod and two of

its subsidiary banks, Glencoe and First Bank of Minnesota, as well as provide advice in various areas. In his affidavit, Benshop criticized Jones' and Miller's affidavits:

6) Mr. Jones' assertion that the transfer or sale of McLeod for Anchor stock has injured McLeod or its subsidiaries is erroneous, for at least the following reasons:

a) FNB Glencoe is adequately capitalized and has no present need for funds from McLeod. Glencoe, and the First Banks of Hutchinson and Stewart are not undercapitalized, and have made no present requests for funds.

b) First Bank of Minnesota at Hutchinson and at Stewart are both adequately capitalized and have no present need for funds from McLeod.

c) The capital of FNB Glencoe is in excess of regulatory guidelines and there has been no request for additional capital made by the regulatory agencies.

d) The capital of First Bank Minnesota is in excess of regulatory guidelines and there has been no request for additional capital made by the regulatory agencies.

e) The cash position of McLeod at the time of Board approval, November 20, 1986, was $571,000, which was sufficient to meet all of McLeod's current obligations and the acquisition of 1,100 shares of Anchor stock.

7) Mr. Miller's Affidavit in which he argues that the exchange of 490 shares of Exchange stock for 1,464 shares of McLeod stock is unfair is based upon the erroneous assumption that the book values of McLeod stock and of Exchange stock equal their fair market values.

8) The following is a description of McLeod's Board of Directors' discussions on November 20, 1986, in which I was a participant, concerning the transfer of 490 shares of Exchange stock for McLeod stock:

a) Mr. Wakefield offered to McLeod 490 shares of Exchange stock for an equitable number of McLeod shares.

b) The McLeod Board determined the value of 490 shares of Exchange stock to be $650,000, or slightly more than twice the book value of the Exchange stock for the following reasons:

i) The premium price that stock of Twin Cities banks was then commanding on the market;

ii) Mr. Jones had previously offered Mr. Wakefield in March, 1985, $600,000 for Mr. Wakefield's 490 shares of Exchange stock, which offer Mr. Wakefield had declined;

iii) In December of 1985, Mr. Wakefield had offered Mr. Jones $700,000 for Mr. Jones' 510 shares of Exchange stock and Mr. Jones declined that offer;

iv) Thus, the Board determined that the fair market value of Mr. Wakefield's 490 shares of Exchange stock was at least in a range between $600,000 and $700,000, and so the Board set the value at $650,000.

c) The McLeod Board then determined the total market value of McLeod to be $1,600,000 (the value of its subsidiary banks less McLeod debt) and divided that figure by the total outstanding shares (3,603) to arrive at a per share price of $444.00.

d) The McLeod Board then divided the $444.00 into $650,000, the value of 490 shares of Exchange stock which yielded 1,464 shares.

e) The Board tested its calculations by adding the value of the Exchange stock ($650,000) to the value of McLeod ($1,600,000) to arrive at a total value of $2,250,000 of which the McLeod stock was 71.1% and the Exchange stock was 28.9%, and the Board calculated that the 3,603 outstanding shares divided by .711 equaled 5,067 shares, which was the total of 3,603 outstanding shares plus 1,464 proposed shares to be issued.

9) Therefore, the Board correctly determined that 1,464 shares of McLeod stock was a proper exchange for the 490 shares of Exchange stock.

Appellant, in his own affidavit, stated:

I verily believe that the purchase by McLeod of these shares is a sound future investment and cannot in any conceivable way adversely affect the liquidity of McLeod Bancshares, Inc. or its subsidiaries. As a majority shareholder in McLeod Bancshares, Inc. it is in my own interest that the liquidity of the said company and its subsidiaries should not be exposed.

\* \* \*

11) The exchange of 490 shares of Exchange State Bank stock for 1464 shares of McLeod Bancshares, Inc. stock dilutes all shareholders' stock in McLeod Bancshares, Inc. This dilution of the stock is not in any way prejudicial and is all fair and equitable in relation to minority shareholders.

\* \* \*

13) That at all times during discussion on and adoption of these resolutions I fully declared my interest in same to the other directors of McLeod Bancshares, Inc.

14) That the resolution passed on November 20, 1986, was in the best interest of McLeod Bancshares, Inc., was passed in good faith, was not for my sole benefit but good for the benefit of the company in general and for all its shareholders.

## ISSUE

Did the trial court properly grant respondents' motion for a temporary injunction, nullifying the two November 1986 transactions approved by McLeod's board of directors?

## ANALYSIS

A temporary injunction is an extraordinary remedy designed to preserve the status quo until a trial on the merits is held. *Krueger v. Washington Federal Savings Bank*, 406 N.W.2d 543, 545–46 (Minn.Ct.App.1987) (citing *Miller v. Foley*, 317 N.W.2d 710, 712 (Minn.1982)). The sole issue before us on appeal is whether the trial court abused its discretion by issuing the injunction. *Krueger*, 406 N.W.2d

at 546. We must view the facts in the light most favorable to the party who prevailed below. *Id.*

At the same time, we must recognize that the facts on which the trial court acts when granting a temporary injunction are, by the nature of the situation, provisional, and that the injunctive authority exercised will continue only until a more scientific analysis of the problem is made possible by trial on the merits. *Village of Blaine v. Independent School District No. 12*, 265 Minn. 9, 13, 121 N.W.2d 183, 187 (1963) (cited in *Dahlberg Brothers, Inc. v. Ford Motor Co.*, 272 Minn. 264, 274, 137 N.W.2d 314, 321 (1965)).

### Failure to make findings

Appellants argue that the trial court's failure to make findings violates Minn.R.Civ.P. 52.01 which requires that:

[I]n granting or refusing interlocutory injunctions the court shall \* \* \* set forth the findings of fact and conclusions of law which constitute the grounds of its action. Requests for findings are not necessary for purposes of review.

In both the order granting the temporary injunction and the later clarifying order, the trial court made no findings. The court's failure to make findings makes appellate review difficult:

The purpose of requiring findings is to permit meaningful review upon appeal and it is therefore necessary that trial courts find facts and state conclusions clearly and specifically. For this reason, the oral findings and conclusions must be stated on the record, in the presence of the parties, in order that they are adequately preserved.

Minn.R.Civ.P. 52.01, Advisory Committee Comments. We do not know if the court stated its findings and conclusions on the record, because the parties did not order a transcript for review on appeal.

Respondent argues this case falls within an exception to the requirement of findings contained in *Crowley Co. Inc. v. Metropolitan Airports Commission*, 394 N.W.2d 542, 545 (Minn.Ct.App.1986). In *Crowley*,

this court noted exceptions to the requirement of findings: "where the record is reasonably clear," *Roberson v. Roberson,* 296 Minn. 476, 478, 206 N.W.2d 347, 348 (1973); where the order decides the disputed facts, *Lafayette Club v. Roberts,* 196 Minn. 605, 611, 265 N.W. 802, 805 (1936); where the findings are immaterial, *Lowell v. North & Carll,* 4 Minn. 25 (Gil. 15) (1860); or if no findings in favor of the appellant are justified, *Cool v. Hubbard,* 293 Minn. 349, 355, 199 N.W.2d 510, 513 n. 1 (1972). The trial court did not find that any of these conditions existed, and our review of the record before the trial court does not disclose any applicable exceptions to the general rule requiring findings. This case does not fall within any of the exceptions noted in *Crowley.*

As the parties' affidavits point up, the facts are in dispute. The parties substantially disagree on whether the Hutchinson and Stewart banks are undercapitalized. Accountants for each side offered conflicting affidavit testimony on whether the Hutchinson and Stewart banks are undercapitalized. This testimony is relevant to Jones' allegations that McLeod's payment of $330,000 would irreparably harm McLeod's subsidiary banks in Hutchinson and Stewart by endangering availability of outside cash should the banks need it. The parties also disagree strongly on whether the two transactions approved by McLeod's board are fair and in the best interests of McLeod, its shareholders, and its subsidiaries. Because the court's lack of findings makes appellate review difficult, we remand for findings.

 Respondents argue that because appellant did not move for amended findings, and because appellant appealed only from the July 13, 1986, order modifying the original April 1986 order granting the injunction, appellant has not properly preserved his issues for appeal. Respondents claim the only issue reviewable is whether the court properly required Wakefield to return the money. Because respondents did not file a notice of review on these issues, they have improperly raised them in their brief. Minn.R.Civ.App.P. 106. How-

ever, we note the April order is reviewable under Minn.R.Civ.App.P. 103.04, which allows review of any order affecting a judgment. Post injunction requests for findings, although encouraged, are not required for appellate review. Minn.R.Civ.P. 52.01.

### Factual Basis for Granting the Injunction

Appellant next argues that the affidavit evidence provided by respondents was insufficient to meet the five elements necessary for a temporary injunction. These elements are:

1) The nature and background of the relationship between the parties preexisting the dispute giving rise to the request for relief.

2) The harm to be suffered by plaintiff if the temporary restraint is denied as compared to that inflicted on defendant if the injunction issues pending trial.

3) The likelihood that one party or the other will prevail on the merits when the fact situation is viewed in light of established precedents fixing the limits of equitable relief.

4) The aspects of the fact situation, if any, which permit or require consideration of public policy expressed in the statutes, State and Federal.

5) The administrative burdens involved in judicial supervision and enforcement of the temporary decree.

*Dahlberg Brothers, Inc. v. Ford Motor Co.,* 272 Minn. at 274–75, 137 N.W.2d at 321–22 (footnotes omitted).

Of the five *Dahlberg* elements, the main one at issue is balancing the harm appellant and McLeod will suffer due to grant of the injunction, compared to the harm inflicted on respondent if the injunction is not granted.

Even viewing the facts in the light most favorable to Jones, Anchor and Exchange, the parties who prevailed below, nowhere do their affidavits pinpoint the extent or nature of the loss they would suffer if the injunction had not been granted.

The affidavits do not allege a present need of capital by McLeod's subsidiary banks. Through the affidavit of Karen Knafla, respondents attempted to show McLeod's subsidiary banks would be harmed by the McLeod purchase of 1100 shares of Anchor stock, a sound holding company, for $330,000. However, respondents' affidavits alleging harm were basically conclusory. Appellant points out that no state or federal regulatory agency has declared any of McLeod's banks in financial jeopardy, or asked McLeod to infuse its subsidiaries with additional capital. Jones' affidavit statements relative to "irreparable harm" are, for the most part, merely conclusory.

We note the trial court did not enjoin a prospective transaction, but enjoined a completed one. The injunction was not issued until several months after the exchange was completed. In the meantime, the parties to the transaction could have changed their positions in reliance on the completion of the transaction. Jones does claim that he acted with expediency. He argues that he did not have knowledge of the November 20, 1986, transactions until several months later, after he resigned his position as director of McLeod in April 1986.

We find, in light of the trial court's lack of any findings to support the grant of an injunction, that the trial court erred by failing to make *Dahlberg* findings, including balancing the parties' relative harm, particularly where material facts were in dispute, as they were here. Respondents argue that the trial court's lack of findings is not essential, because the trial court supplied a reviewable record for its legal conclusion in its memorandum attached to the April 13, 1987, order granting the injunction. The memorandum stated:

> The matters submitted to the Court and the arguments of counsel have convinced the Court at this juncture, at least, that it is appropriate to keep this matter in a status quo, the Court relying primarily upon the supporting papers of the movant.

Respondents argue that the "supporting papers" of the movants provide a sufficient record to satisfy *Dahlberg*. At this stage

of the proceedings, we disagree. The bare allegations contained in respondents' pleadings, their trial memorandums, and oral argument to the court are not, by themselves, enough to warrant the extraordinary remedy of a temporary injunction nullifying a completed transaction. The only other "papers" are affidavits submitted by respondents. Reviewing these papers in their best light, we note they are conclusory only and squarely countered by the affidavits of appellant. We hold that, without detailed findings pursuant to Minn.R.Civ.P. 52.01 and the analysis pursuant to *Dahlberg*, the bare affidavits of respondents are not sufficient.

We also note that the trial court in its memorandum relied partially on oral arguments of counsel. No transcription of the oral argument was provided as part of the appeal record, making review of those arguments moot.

### DECISION

Where material facts are at issue, detailed findings of fact are required to support the granting of a temporary injunction. The record does not support the grant of the extraordinary remedy of a temporary injunction.

Injunction vacated and case remanded.