David M. PIETSCH, D.C.,
et al., Appellants,

v.

MINNESOTA BOARD OF CHI-
ROPRACTIC EXAMIN-
ERS, Respondent.

No. C6–02–2117.

Supreme Court of Minnesota.

July 22, 2004.

John B. Wolfe, Jr., Wolf & Associates, St. Paul, MN, Wilbur W. Fluegel, Minneapolis, MN, for Appellants.

Mike Hatch, Attorney General, Steven M. Gunn, Assistant Attorney General, St. Paul, MN, for Respondent.

William J. Wernz, Robin M. Wolpert, Minneapolis, MN, Teresa J. Nelson, St. Paul, MN, for Amicus Curiae Minnesota Civil Liberties Union.

## OPINION

PAGE, Justice.

David Pietsch, D.C., seeks review of a decision of the court of appeals affirming the Minnesota Board of Chiropractic Examiners' (the Board) disciplinary action against him based on the Board's conclusion that he engaged in unprofessional conduct in violation of Minn.Stat. § 148.10, subd. 1(a)(11) and (e) (2002). We reverse and remand.

Pietsch, a Doctor of Chiropractic, owns and operates the Pietsch Chiropractic Clinic in St. Paul, Minnesota. Pietsch was first licensed to practice chiropractic in Minnesota in February 1998. At all times relevant to the Board's disciplinary action, Pietsch's practice consisted primarily of treating victims of motor vehicle accidents whose injury claims were covered by no-fault automobile insurance. A sizeable number of his patients were from the Hmong and Laotian communities.

In 1999, Pietsch contracted with Hue Xiong and Cha Xiong of Xiong Translation & Transportation Company (collectively, the Xiongs) to market his chiropractic services to the Hmong community. The Xiongs' practice was to obtain publicly available accident reports from local police departments every morning. These reports were then used to identify accident victims by ethnic group so that one of Pietsch's agents from the same ethnic group could call or visit the victims in order to solicit them to become patients at Pietsch's clinic. The record indicates that Pietsch's clinic paid Xiong Translation and

Transportation $71,000 in 1999 and $95,000 in 2000.

Sometime before March 1, 2001, the Board received complaints alleging that Pietsch was engaged in improper fee splitting with the Xiongs. The Board's authority includes the power to grant, deny, revoke, suspend, condition, limit, restrict, or qualify a license to practice chiropractic. *See* Minn.Stat. § 148.10. The Board's complaint panel met with Pietsch on March 1, 2001, to discuss the fee splitting complaints. At that meeting, Pietsch denied paying a fee or commission for patient referrals. On March 8, 2001, the Board informed Pietsch by letter that, based on the facts before it, it had concluded that there was insufficient evidence to warrant pursuing the complaints further. Subsequent to the letter, the Board received additional evidence and, on March 21, 2002, the complaint panel issued a notice and order for hearing alleging that Pietsch engaged in fee splitting in violation of Minn.Stat. § 148.10, subd. 1(a)(16), and engaged in unprofessional conduct in violation of Minn.Stat. § 148.10, subd. 1(a)(11) and (e), by using "runners" or "cappers"[1] to solicit people involved in automobile accidents, by instructing chiropractic interns how to falsify treatment bills and examination reports to defraud insurance companies, and by instructing interns that they could care for non-English-speaking-patients without communicating with them about their health or medical problems.

In response to the complaint panel's request for admissions, Pietsch admitted paying the Xiongs to identify and contact Hmong accident victims for the purpose of soliciting them to become patients of his clinic. On the strength of these admis-

---

1. A "runner" is "a person whose business it is to solicit patronage or trade." *The Random House Dictionary of the English Language* 1683 (2d ed.1987). A "capper" is "a lure, decoy, or steerer esp. in some illicit or questionable activity." *Webster's Third New International Dictionary* 333 (10th ed.1993).

sions, the complaint panel brought a motion for partial summary disposition [2] on the issues of fee splitting and the use of "runners" or "cappers" to solicit patients.[3] A hearing was held on the motion before an administrative law judge (ALJ) at the Office of Administrative Hearings. The ALJ found that the complaint panel "ha[d] established that [Pietsch] paid 'runners' to solicit business from accident victims * * * in violation of Minn.Stat. § 148.10, subd. 1(a)(16)," and that in doing so Pietsch also engaged in unprofessional conduct. The ALJ concluded, however, that the complaint panel "failed to demonstrate that [Pietsch's] conduct was per se unprofessional because the [Board] introduced no evidence to support a finding that [Pietsch's] conduct violated standards of professional behavior established·by the consensus of the expert opinion in the chiropractic community." Ultimately, the ALJ recommended that the Board's summary disposition motion be granted and that disciplinary action be taken against Pietsch's chiropractic license.

The Board considered the ALJ's recommendation at a hearing in October 2002 and, on November 5, 2002, the Board issued its findings of fact, conclusions, and final order. In its findings, the Board disagreed with the ALJ's finding that Pietsch's conduct was not unprofessional conduct per se, but otherwise adopted the ALJ's findings in their entirety. The Board found that Pietsch's conduct in using paid "runners" or "cappers" constituted fee splitting, in violation of Minn.Stat. § 148.10, subd. 1(a)(16), and that fee splitting, as well as using "runners" or "cap-

pers" to solicit clients, constituted unprofessional conduct, in violation of Minn.Stat. § 148.10, subd. 1(a)(11) and (e). In support of these findings, the Board noted that "the employment of runners and the use of fee splitting arrangements negatively affect the professional-patient/client relationship and are unethical, deceptive and harmful to the public." The Board went on to say:

Fee splitting arrangements with runners can influence the type of treatment a chiropractor provides to a patient and can encourage patients to exaggerate or invent injuries. Obtaining patients by employing runners to follow up on daily police accident reports preys on people when they are most vulnerable. These patients are not given an opportunity to carefully consider and choose among health care options. They are, in fact, pressured into choosing the runner's employer for their health care.

Furthermore, [Pietsch] admits that he targeted clients from the Hmong/Southeast Asian communities. These people may have language and cultural barriers which make [Pietsch's] behavior even more egregious.

Based on its findings and conclusions, the Board suspended Pietsch's chiropractic license for three years, assessed a $30,000 civil penalty, and set out a number of conditions Pietsch was required to meet before he could be reinstated.

Pietsch appealed to the court of appeals, raising the following issues: (1) whether the Board erred as a matter of law in ruling that the use of paid runners to solicit patients constituted fee splitting

---

**2.** Summary disposition is the administrative equivalent of summary judgment. *See* Minn. R. 1400.5500(K) (2003).

**3.** The complaint panel did not seek summary disposition with respect to the unprofessional conduct allegations related to instructing interns how to defraud insurance companies, falsifying treatment bills and examination reports, and failure to properly communicate with non-English-speaking patients. Therefore, there are no issues relating to those allegations before the court in this appeal.

when fees obtained were not split with the runners; and (2) whether the Board erred as a matter of law in ruling that the use of paid runners to solicit patients constituted unprofessional conduct.

The court of appeals reversed the Board's determination with respect to fee splitting and affirmed with respect to unprofessional conduct. The court unanimously held that the Board's conclusion that Pietsch engaged in fee splitting was not supported by substantial evidence. *Pietsch v. Minnesota Bd. of Chiropractic Exam'rs,* 662 N.W.2d 917, 922 (Minn.App. 2003). Specifically, the court held that, because the Xiongs were salaried employees and there was no evidence to suggest Pietsch split fees with them on a per-patient referral basis, there was no violation of Minn.Stat. § 148.10, subd. 1(a)(16). *Id.* at 921. As for the charge of unprofessional conduct, by panel majority, the court of appeals held that there was substantial evidence to conclude that Pietsch's use of runners to solicit patients was unethical, deceptive, and harmful to the public as well as the chiropractic profession. *Id.* at 924. The dissenting judge would have held that the unprofessional conduct statute was unconstitutionally vague as applied because the statute does not expressly prohibit paying "runners" a flat salary to solicit patients or otherwise inform chiropractors that such conduct is prohibited. *Id.* at 925–26 (Forsberg, J., dissenting).

## I.

■ Summary disposition is the administrative equivalent of summary judg-

ment. *See* Minn. R. 1400.5500(K) (2003). Review of a summary judgment award consists of determining whether there are any genuine issues of material fact and whether there was an error in applying the law to the facts. *Jorgensen v. Knutson,* 662 N.W.2d 893, 897 (Minn.2003). When summary judgment is granted after applying the law to undisputed facts, the legal conclusion is reviewed de novo. *Lefto v. Hoggsbreath Enters., Inc.,* 581 N.W.2d 855, 856 (Minn.1998). Statutory interpretation is a question of law subject to de novo review. *Burkstrand v. Burkstrand,* 632 N.W.2d 206, 209 (Minn.2001).

■ In his petition for review to this court, Pietsch raised one issue: Whether application of Minn.Stat. § 148.10, subd. 1(a)(11) and (e), violated his right to due process in that the term "unprofessional conduct" is unduly vague. In his brief to this court, Pietsch argues that his conduct did not constitute unprofessional conduct as defined by Minn.Stat. § 148.10, subd. 1(a)(11) and (e). Pietsch also argues that there was no support for the statement in the court of appeals' opinion that the "board determined that relator engaged in unprofessional conduct by paying runners to solicit accident victims, regardless of whether relator's conduct constituted unlawful fee splitting." He contends, therefore, that it was error for the court of appeals to have based its decision on illegal solicitation, a ground not relied on by the Board.[4] Finally, in his reply brief, Pietsch

---

4.  Pietsch's argument that the court of appeals erred by affirming on a ground that the Board did not rely on is undermined by the following language in the Board's order:

    The Board finds that *the employment of runners* and the use of fee splitting arrangements negatively affect the professional-patient/client relationship and are *unethical, deceptive and harmful to the public.* * * *

*Obtaining patients by employing runners to follow up on daily police accident reports preys on people when they are most vulnerable.*

(Emphasis added.) Because it is clear that the Board considered Pietsch's use of runners to solicit patients a separate violation of the unprofessional conduct statute, we conclude

joins in the issue first raised by amicus Minnesota Civil Liberties Union in its brief to this court that section 148's unprofessional conduct provision restricts constitutionally protected commercial speech. The Board has not challenged the court of appeals' holding that Pietsch's conduct did not constitute fee splitting.

We begin by analyzing the statutory language at issue. Minnesota Statutes § 148.10, subdivision 1, provides, in relevant part:

(a) The state board of chiropractic examiners may refuse to grant, or may revoke, suspend, condition, limit, restrict or qualify a license to practice chiropractic, or may cause the name of a person licensed to be removed from the records in the office of the court administrator of the district court for:

* * * *

(11) Unprofessional conduct.

* * * *

(e) For the purposes of paragraph (a), clause (11), unprofessional conduct means any unethical, deceptive or deleterious conduct or practice harmful to the public, any departure from or the failure to conform to the minimal standards of acceptable chiropractic practice, or a willful or careless disregard for the health, welfare or safety of patients, in any of which cases proof of actual injury need not be established. Unprofessional conduct shall include, *but not be limited to,* the following acts of a chiropractor:

(1) gross ignorance of, or incompetence in, the practice of chiropractic;

(2) engaging in conduct with a patient that is sexual or may reasonably be interpreted by the patient as sexual, or in any verbal behavior that is seductive or sexually demeaning to a patient;

(3) performing unnecessary services;

(4) charging a patient an unconscionable fee or charging for services not rendered;

(5) directly or indirectly engaging in threatening, dishonest, or misleading fee collection techniques;

(6) perpetrating fraud upon patients, third-party payors, or others, relating to the practice of chiropractic, including violations of the Medicare or Medicaid laws or state medical assistance laws;

(7) advertising that the licensee will accept for services rendered assigned payments from any third-party payer as payment in full, if the effect is to give the impression of eliminating the need of payment by the patient of any required deductible or copayment applicable in the patient's health benefit plan; or advertising a fee or charge for a service or treatment different from the fee or charge the licensee submits to the third-party payer for that service or treatment. As used in this clause, "advertise" means solicitation by the licensee by means of handbills, posters, circulars, motion pictures, radio, newspapers, television, or in any other manner. In addition to the board's power to punish for violations of this clause, violation of this clause is also a misdemeanor;

(8) accepting for services rendered assigned payments from any third-party payer as payment in full, if the effect is to eliminate the need of payment by the patient of any required deductible or copayment applicable in the patient's health benefit plan, except as hereinafter provided; or collecting a fee or charge for a service or treatment different from the fee or charge the licensee submits to a third-party payer for that service or treatment, except as hereinafter provided. This clause is intended to

that there is no merit to Pietsch's contention that the court of appeals erred on that basis.

prohibit offerings to the public of the above listed practices and those actual practices as well, except that in instances where the intent is not to collect an excessive remuneration from the third-party payer but rather to provide services at a reduced rate to a patient unable to afford the deductible or copayment, the services may be performed for a lesser charge or fee. The burden of proof for establishing that this is the case shall be on the licensee; and

(9) any other act that the board by rule may define.

(Emphasis added.)

Applying the statute, the Board concluded that using "runners" or "cappers" to solicit patients "negatively affect[ed] the professional-patient/client relationship and [was] unethical, deceptive, and harmful to the public" and, therefore, constituted unprofessional conduct. In support of its conclusion, the Board found that: (1) the Xiongs provided accident victim solicitation for Pietsch through an entity known as Xiong Translation & Transportation and Pietsch's clinic paid Xiong Translation & Transportation $71,000 in 1999 and $95,000 in 2000; and (2) Pietsch instructed the Xiongs to obtain police reports in the early morning and to identify accident victims by ethnicity so that one of his agents of the same ethnic group could contact the

victim as soon as possible. The Board further found:

Fee splitting arrangements with runners can influence the type of treatment a chiropractor provides to a patient and can encourage patients to exaggerate or invent injuries. Obtaining patients by employing runners to follow up on daily police accident reports preys on people when they are most vulnerable. These patients are not given an opportunity to carefully consider and choose among health care options. They are, in fact, pressured into choosing the runner's employer for their health care.

Given these findings and conclusions, it appears that the Board was treating the use of "runners" or "cappers" to obtain business as unprofessional conduct per se.

Section 148.10, subdivision 1(e), states that unprofessional conduct includes "any unethical, deceptive or deleterious conduct or practice harmful to the public." It does not, however, specifically make the use of "runners" or "cappers"[5] to obtain business unprofessional conduct per se.[6] In the absence of statutory language, an industry standard clearly recognizing the use of "runners" or "cappers" to obtain business as unprofessional may be enough to find Pietsch's conduct per se unprofessional. Here, however, there is no evidence in the record of an industry standard indicating that the use of "runners" or "cappers" to

5. While the arguments come to us in the context of using "runners" or "cappers," the real question is whether in-person solicitation is permissible irrespective of whether Pietsch used "runners" or "cappers," or whether Pietsch engaged in solicitation himself.

6. An example of a statute that specifically designates the use of "cappers" to obtain business as unprofessional conduct per se is Minn.Stat. § 148.57 (2002), which governs the licensing of optometrists. The pertinent language of Minn.Stat. § 148.57, subd. 3 (2002), reads:

The board may revoke the license or suspend or restrict the right to practice of any person who has been convicted of any violation of sections 148.52 to 148.62 or of any other criminal offense, or who violates any provision of sections 148.571 to 148.576 or who is found by the board to be incompetent or guilty of unprofessional conduct. *"Unprofessional conduct" means any conduct of a character likely to deceive or defraud the public, including * * * the employment of "cappers" or "steerers" to obtain business.*
(Emphasis added.)

solicit patients is per se unprofessional. Accordingly, we conclude that Pietsch's conduct does not constitute unprofessional conduct per se.

Having concluded that Pietsch's conduct does not constitute unprofessional conduct per se, we must determine whether the record supports the conclusion that Pietsch's conduct "negatively affect[ed] the professional-patient/client relationship and [was] unethical, deceptive and harmful to the public." A careful review of the record before us leads us to conclude that it does not. Indeed, the record is silent with respect to the names of those contacted, the nature and extent of the injuries at the time of the contact, and what specifically took place with each contact. The record does not indicate: (1) what was said by the Xiongs when they contacted accident victims; (2) whether the Xiongs pressured the accident victims; (3) the susceptibility of particular accident victims to the particular pressure, if any, applied by the Xiongs; (4) whether the accident victims had the opportunity to reflect on the decision to obtain treatment; (5) whether any of the accident victims found the Xiongs' solicitations objectionable; and (6) whether fraud was employed in the course of the solicitation.[7] The record presented simply does not support the conclusion reached by the Board.

Because a chiropractor's use of "runners" or "cappers" to solicit business is not unprofessional conduct per se and because there is no evidence, beyond mere assertions, in the record to support a conclusion that Pietsch's conduct was "unethical, deceptive and harmful to the public," we conclude that the Board improperly granted the summary disposition. We therefore reverse the court of appeals' decision and remand for further proceedings.[8]

Reversed and remanded.

---

7. Minnesota Statutes § 609.612 (2002), which was passed after the Board initiated its disciplinary action against Pietsch, makes it a felony to "employ[ ], use[ ], or act[ ] as a runner, capper, or steerer." The statute defines a "runner," "capper," or "steerer" as "a person who for pecuniary gain procures patients or clients at the direction of, or in cooperation with, a health care provider when the person knows * * * that the provider's purpose is to fraudulently perform or obtain services or benefits under or relating to a contract of motor vehicle insurance." Minn.Stat. § 609.612, subd. 1(c) (2002). Under this statute, using "runners" is illegal only when the

"runners" are engaged in fraud. This statutory language indicates that the legislature did not consider the non-fraudulent use of "runners" as conduct in need of proscription.

8. Because we are able to resolve this case on non-constitutional grounds, we have no need and therefore decline to address Pietsch's due process and free speech claims. *See In re Senty–Haugen*, 583 N.W.2d 266, 269 n. 3 (Minn.1998) ("It is well-settled law that courts should not reach constitutional issues if matters can be resolved otherwise.").