HY-VEE FOOD STORES, INC., Appellant,

v.

MINNESOTA DEPARTMENT OF HEALTH, Respondent.

No. A04–548.

Supreme Court of Minnesota.

Oct. 27, 2005.

---

Michael R. Drysdale, Dorsey & Whitney, L.L.P., Minneapolis, for appellant.

Michael A. Hatch, MN Atty. Gen., Kristen M. Olsen, Audrey Kaiser Manka, Asst. Attys. Gen., St. Paul, for respondent.

George Green, Vice President, Gen. Counsel, Food Marketing Institute, Washington, DC, John P. Borger, Faegre & Benson., L.L.P., Minneapolis, for amici curiae.

Heard, considered, and decided by the court en banc.

## OPINION

BLATZ, Chief Justice.

Respondent Minnesota Department of Health (MDH) administers the federally funded Special Supplemental Nutrition Program for Women, Infants, and Children (WIC). MDH disqualified appellant Hy–Vee Food Stores, Inc. as a WIC vendor for three years for violating a rule that prohibits selling tobacco products in exchange for WIC vouchers. Hy–Vee appealed, arguing that the inadvertent acceptance of a WIC voucher in payment for groceries that included one pack of cigarettes did not constitute a violation. An administrative law judge (ALJ) recommended summary disposition in favor of MDH, and the Commissioner of Health

adopted the ALJ's recommendation. Hy–Vee appealed, and the court of appeals affirmed. *Hy–Vee Food Stores, Inc. v. Minnesota Dept. of Health,* No. A04–548, 2004 WL 2340189 (Minn.App. Oct. 19, 2004). We affirm.

The WIC program, which is administered at the federal level by the United States Department of Agriculture (USDA), provides limited-income infants, young children, and pregnant, postpartum or breastfeeding women with supplemental foods, nutrition education, and health development. 7 C.F.R. § 246.1 (2005). WIC participants exchange WIC vouchers for WIC-eligible products, which are listed on the face of the vouchers, at local authorized vendors. 7 C.F.R. § 246.12(f) (2005). MDH receives federal cash grants to administer the WIC program in Minnesota and has promulgated rules pursuant to, and consistent with, USDA's WIC rules. *See* Minn. R. ch. 4617 (2005). To participate in the program, a vendor must enter into a written vendor agreement with MDH that sets forth compliance procedures and details the sanctions to be imposed in the event of a violation. 7 C.F.R. § 246.12(h)(1), (3), (5) (2005).

The Hy–Vee store in Windom, Minnesota, was authorized as a WIC vendor on January 1, 2003. Hy–Vee's vendor agreement with MDH specified that MDH "shall disqualify a vendor for three years if the Vendor provides any alcohol, alcoholic beverage, or tobacco product in exchange for one or more vouchers." That provision was based on an identical MDH administrative rule, Minn. R. 4617.0084, subp. 4

(2005). The MDH rule was in turn based on a USDA regulation that provides: "The State agency must disqualify a vendor for three years for: (A) One incidence of the sale of alcohol or alcoholic beverages or tobacco products in exchange for food instruments." 7 C.F.R. 246.12(*l*)(1)(iii) (2005).[1]

On April 13, 2003, the father of a WIC-eligible child and boyfriend of the child's mother, a WIC participant, went to the Windom Hy–Vee store and purchased eight items, totaling $19.34, with a WIC voucher.[2] Among the eight items purchased was a $3.19 pack of cigarettes. The remaining seven items were WIC-approved food items. The father did not offer any form of payment other than the voucher. The cashier accepted the voucher in payment for all eight items, including the cigarettes, writing the total price on the voucher, which the father then signed. The cashier gave the father a receipt for the transaction. Hy–Vee subsequently redeemed the voucher for the full amount of the transaction.

After the father returned home with his purchases from Hy–Vee, the mother reviewed the receipt and noticed that the cigarettes had been included in the WIC voucher purchase. Concerned that the tobacco purchase might jeopardize her participation in the WIC program, she contacted the local WIC agency to report what had occurred and sent it the receipt. The local agency notified MDH, and the MDH compliance coordinator notified Hy–Vee by letter that it was terminating the store's authorization as a WIC vendor for

1. The parties agree that the word "provides" in the state rule and the vendor agreement is synonymous with the word "sale" in the federal rule. In addition, the term "voucher" in the state rule is a form of acceptable WIC payment that is included in the term "food instruments" used in the federal rule. *See* 7

C.F.R. § 246.2 (2005) (defining "food instrument"). For convenience, we will refer collectively to the state and federal rules as "the WIC tobacco rule."

2. The father was authorized by proxy to use his girlfriend's voucher.

three years because Hy–Vee "violated the terms of your WIC vendor agreement and the Minnesota rules that govern the WIC program."

Hy–Vee appealed the three-year disqualification, and a contested case was initiated before an ALJ. Both parties moved for summary disposition.[3] In support of its motion, Hy–Vee submitted the affidavit of the father stating that he had intended to pay for the cigarettes with cash, but was distracted by his young son during the transaction and "did not notice that the cigarettes were included in the WIC purchase." Hy–Vee also submitted an affidavit from the assistant manager of the store, who was likely the cashier that processed the transaction. She stated that she did not remember the transaction, but that she was certain "I did not realize that I had included the cigarettes" in the father's purchase. She further stated that she had "never deliberately exchanged a tobacco product for a WIC voucher."

For the purposes of deciding the summary disposition motions, the ALJ viewed the facts in the light most favorable to Hy–Vee and accepted as true Hy–Vee's assertions that the inclusion of cigarettes in the transaction was inadvertent, and that neither Hy–Vee nor the buyer intended to exchange WIC vouchers for tobacco products. The ALJ recommended summary disposition for MDH because there was no genuine issue of material fact regarding whether Hy–Vee provided tobacco products in exchange for a WIC voucher. The ALJ concluded that under the applicable state and federal rules intent is not an element of the violation, and that the rules require a three-year vendor disqualification for the first violation of the WIC tobacco rule. The Commissioner of Health adopted the ALJ's recommendation, granted MDH's motion for summary disposition, and ordered Hy–Vee's disqualification for three years.

Hy–Vee appealed by petition for writ of certiorari, and the court of appeals affirmed. The court held that (1) MDH's interpretation of the WIC tobacco rule was entitled to some deference; (2) there was sufficient proof of intent to establish a sale of tobacco products even though neither party may have intended a tobacco-for-WIC-voucher exchange; (3) inadvertent acceptance of a WIC voucher in payment for tobacco products constitutes a violation of the tobacco rule; and (4) the 3–year disqualification was not arbitrary or capricious. *Hy–Vee Food Stores, Inc.*, 2004 WL 2340189 at *1–*4. We granted Hy–Vee's petition for review.

The scope of our review is governed by the Minnesota Administrative Procedures Act, Minn.Stat. § 14.63–69 (2004), which provides that an appellate court reviewing an agency decision "may reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the administrative" decision (a) violated a constitutional provision, (b) exceeded the agency's statutory authority or jurisdiction, (c) was made upon unlawful procedure, (d) was affected by an error of law, (e) was unsupported by substantial evidence in view of the entire record as submitted, or (f) was arbitrary or capricious. Minn.Stat. § 14.69. Hy–Vee argues that the decision here was affected by an error of law, because MDH and the court

3. Summary disposition is the administrative equivalent of summary judgment. *Pietsch v. Minnesota Bd. of Chiropractic Examiners*, 683 N.W.2d 303, 306 (Minn.2004). "Consistent with law, the [administrative law] judge shall * * * recommend a summary disposition of the case or any part thereof where there is no genuine issue as to any material fact or recommend dismissal where the case or any part thereof has become moot or for other reasons." Minn. R. 1400.5500(K) (2005).

of appeals misinterpreted the WIC tobacco rule in concluding that an inadvertent exchange of tobacco products for a WIC voucher constitutes a prohibited sale in violation of the rule.

The WIC tobacco rule provides:

> *Three-year disqualification.* The State agency must disqualify a vendor for three years for:
>
> (A) One incidence of the sale of alcohol or alcoholic beverages or tobacco products in exchange for food instruments.

7 C.F.R. § 246.12(*l*)(1)(iii)(A).[4] The plain language of the WIC tobacco rule dictates the result reached by MDH and the court of appeals.[5] The rule requires three elements to establish a violation: (1) there must be a sale; (2) the object of the sale must be tobacco products; and (3) the method of payment must be food instruments. All three elements were established by MDH. Hy–Vee admits that the father intended to buy and the cashier intended to sell the cigarettes, and the means of payment was a WIC voucher.

Hy–Vee does not dispute that the vendor and the buyer engaged in a tobacco-for-voucher exchange. Hy–Vee contends, nevertheless, that this exchange did not constitute a "sale" under the WIC tobacco rule. Hy–Vee argues that the sworn statements of the cashier and buyer, set forth in their respective affidavits, that they did not intend to sell or buy cigarettes as part of the WIC transaction, demonstrate a "mutual mistake." Hy–Vee further asserts that "[a]ny transaction that is the product of such a mutual mistake is void and subject to rescission." In Hy–Vee's view, the cashier and buyer mistakenly engaged in a *voucher*-for-tobacco exchange, but intended a *cash*-for-tobacco exchange. According to Hy–Vee, because the cashier and the buyer have averred that they did not intend to exchange the cigarettes for a WIC voucher, "there was no meeting of the minds"—that is, no mutual assent. Thus, Hy–Vee asserts "there was no 'sale' as a matter of law" and therefore no violation. We disagree.

The term "sale" is not defined in the rules, but its meaning is not uncertain. MDH and the court of appeals relied on the definition of sale found in the Uniform Commercial Code, which defines "sale" as "the passing of title from the seller to a buyer for a price." Minn.Stat. § 336.2–106(1) (2004). We see no reason to deviate from that commonly-accepted definition for the purposes of the WIC tobacco rule. *Cf.* Minn.Stat. § 645.08(1) (2004) (words and phrases are construed according to their common and approved usage).[6] Hy–Vee asserts—and we agree—that the formation of a sales contract requires the mutual assent of the parties engaging in the transaction. *See Cederstrand v. Lutheran Brotherhood,* 263 Minn. 520, 531, 117 N.W.2d 213, 221 (1962); *Bergstrom v. Sambo's Restaurants, Inc.,* 687 F.2d 1250,

4. We reiterate that for simplicity of discussion, we address only the language of the federal rule, which the parties agree bears the same meaning as the state rule. We note, however, that the disqualification sanction was based on violation of the vendor agreement and the state rule.

5. Because the language of the rules is unambiguous, the argument between the parties about the extent to which the courts should defer to the agency's interpretation of its rule is irrelevant to our analysis. "No deference is given to the agency interpretation if the language of the regulation is clear and capable of understanding." *St. Otto's Home v. Minn. Dept. of Human Services,* 437 N.W.2d 35, 40 (1989); *see Jasper v. Comm'r of Public Safety,* 642 N.W.2d 435, 440 (Minn.2002).

6. *See also Black's Law Dictionary* 1337 (7th ed. 1999) (defining "sale" as, inter alia, "The transfer of property or title for a price.")

1256 (8th Cir.1982) (applying Minnesota law); Restatement of Contracts (Second) § 17(1) (1988). A manifestation of mutual assent "may be inferred wholly or partly from words spoken or written or from the conduct of the parties." *Cederstrand,* 263 Minn. at 532, 117 N.W.2d at 221; Restatement of Contracts (Second) § 19(1).

Here, the undisputed facts, as found by the ALJ, are that:

> [A] customer placed items in the check-out aisle, those items were scanned by a Hy–Vee employee, a total price was identified, a food instrument (WIC voucher) was offered by the customer as payment, the food instrument was accepted as payment for all the items scanned, a receipt was given to the customer, and the customer left with the items.

As the court of appeals stated, "[t]he record demonstrates that the cigarettes were delivered to the customer and [Hy–Vee] received the price." *Hy–Vee Food Stores, Inc.,* 2004 WL 2340189 at *2. This conduct satisfies the UCC definition of sale, and there is no suggestion that either participant intended otherwise. In fact, Hy–Vee admits that the father intended to buy the cigarettes and Hy–Vee intended to sell them. Accordingly, we agree with the court of appeals' conclusion that "MDH did not make an error of law in concluding that a sale occurred." *Id.*

Hy–Vee argues, however, that the conclusion that the vendor intended to sell cigarettes and the buyer intended to buy cigarettes—establishing their mutual assent to engage in a sale—"begs the proper question." From Hy–Vee's perspective, the vendor intended to sell tobacco for *cash,* a "perfectly legal transaction." But the vendor did not intend to "engage in prohibited conduct" by selling tobacco for *vouchers.* Thus, from Hy–Vee's perspective, and the dissent agrees, the question of whether the vendor acted with intent goes to the method of payment the vendor intended to accept. Under such an analysis, a "sale" has taken place for the purposes of the WIC tobacco rule only if the vendor specifically intended to accept a WIC voucher rather than cash. Hy–Vee asserts that this proposition is supported by the state and federal rules and the common law. On the contrary, the governing rules and the generally accepted test for a sale dispel rather than support Hy–Vee's argument.

We first observe that the method of payment is not generally germane to determining whether a sale has taken place. Rather, as discussed above, a sale requires the mutually-assented-to transfer of title from seller to buyer for a price—all elements that have been met as a matter of law in the case at hand. The WIC tobacco rule, however, requires three elements to establish a *violation:* (1) there must be a sale; (2) the object of the sale must be tobacco products; and (3) the method of payment must be food instruments. Importantly, a sale can occur even if either or both of the latter two elements are not satisfied, but a violation cannot. Under the rule, therefore, the method of payment establishes not whether a *sale* has taken place, but whether a *violation* of the rule has occurred. Indeed, as Hy–Vee states in its brief, "[e]xchanging tobacco products *for a WIC voucher* is an essential element of the violation." (Emphasis in original.) But it is not an essential element of a sale, and the WIC tobacco rule's description of the additional elements that constitute a violation does not expand the definition of sale.

Hy–Vee's assertion that the vendor did not subjectively intend to accept a voucher as the means of payment is relevant only if liability under the rule requires a showing of intent to accept a voucher as the method

of payment. There is, however, nothing in the WIC tobacco rule that supports imposing an intent requirement on the method of payment element. Hy–Vee attempts to achieve that effect by conjoining the element of a sale, which does require intent, with the element of method of payment (exchange for food instruments). The language of the rule does not support that conjunction. Moreover, imposing an intent requirement on the method of payment is directly contrary to the express provision in the federal regulations that eliminates intent as an element of vendor violations. Specifically, USDA defines "vendor violation" as

> *any intentional or unintentional action* of a vendor's current owners, officers, managers, agents, or employees (with or without the knowledge of management) that violates the vendor agreement or Federal or State statutes, regulations, policies, or procedures governing the Program.

7 C.F.R. § 246.2 (emphasis added). Under this definition, where—as here—a vendor has engaged in conduct that violates a provision of the state or federal regulations, the enforcing agency is not required to prove intent in order to prove a violation. *See* 64 Fed. Reg. 13,315–16 (Mar. 18, 1999) ("The intent to commit a violation versus inadvertent human error is not a distinction that State agencies must establish in order to impose sanctions * * *.").

Hy–Vee asserts that the definition of "vendor violation" is circular, because MDH and reviewing courts must look to the specific language of a provision to determine what constitutes a violation. Although we agree that we must look to the language of specific provisions to identify the conduct that constitutes a violation, we disagree that this renders the vendor violation definition circular. Rather, the definition clarifies that a vendor is liable for actions that violate the standard of conduct set forth in its vendor agreement, state regulations, or federal regulations—regardless of whether the violation was intentional or inadvertent. Thus, when a vendor engages in proscribed conduct, strict liability applies.

Hy–Vee also argues that the vendor violation definition only establishes "that intent is not a required element of all violations," and that when a specific violation provision involves conduct that inherently requires intent, the general vendor violation definition is superseded. Specifically, Hy–Vee contends that three sections of the mandatory vendor sanctions rule involve conduct that necessarily must be intentional in order to be a violation, and therefore the general vendor violation definition that eliminates the intent requirement cannot be construed to apply to *all* violations. Hy–Vee argues that intent is inherent in the conduct described in the parts of the rule that mandate sanctions for (1) criminal convictions of trafficking in food instruments or buying or selling firearms, ammunition, or drugs in exchange for food instruments, 7 C.F.R. § 246.12(*l*)(1)(i) (2005), (2) buying or selling of food instruments for cash, *id.* § 246.12(*l*)(1)(ii)(B) (2005), and (3) selling alcohol or tobacco products in exchange for food instruments—the WIC tobacco rule at issue here, *id.* § 246.12(*l*)(1)(iii)(A).

Hy–Vee's analysis is based on misreading of the regulations. While a criminal conviction for trafficking in food instruments may require some level of criminal intent, the mandatory sanction rule itself recognizes that in some circumstances there could be a conviction without vendor intent. The regulation that prescribes permanent disqualification for a vendor "convicted of trafficking in food instruments or selling firearms, ammunition, explosives, or controlled substances

* * * in exchange for food instruments," 7 C.F.R. § 246.12(*l*)(1)(i), also contains a form of an "innocent owner" defense. Specifically, it provides that the state agency may impose a civil money penalty in lieu of disqualification if it determines that the vendor had in place an effective program "to prevent trafficking and the ownership of the vendor was not aware of, did not approve of, and was not involved in the conduct of the violation." *Id.* § 246.12(*l*)(1)(i)(B). This provision not only acknowledges the possibility of lack of intent for the violation, but consistent with the policy of strict liability for vendor violations, this defense affects only the sanction imposed, not liability. Second, with regard to the section that imposes disqualification for "buying or selling of food instruments for cash (trafficking)," Hy–Vee argues that the parenthetical reference to "trafficking" essentially imports into the WIC rule an intent requirement from the Federal Sentencing Guidelines for drug trafficking offenses. However, USDA's comments on adoption of the mandatory sanctions for trafficking reveal that those provisions are based on specific legislation directed at trafficking in this program, so reference to criminal drug trafficking language is both unnecessary and inappropriate. *See* 64 Fed. Reg. 13,311, 14–15 (explaining that adjustments to penalties for trafficking in food instruments were necessitated by the William F. Goodling Child Nutrition Reauthorization Act of 1998, P.L. 105–336). Finally, with respect to the WIC tobacco rule itself, we have demonstrated that the intent factor inherent in the proof of a sale does not extend to the separate element of exchange for food instruments that is necessary for a violation. Accordingly, the three specific sections of the mandatory vendor sanctions rule relied on by Hy–Vee do not support the conclusion that the vendor violation definition is applicable only to *some* vendor violations. More importantly, they provide no basis to conclude that the elimination of an intent requirement by that definition does not apply to the WIC tobacco rule.

Hy–Vee's attempt, and that of the dissent, to cabin the scope of the vendor violation definition also fail because that definition is located in the general definitions section for Part A of the WIC regulations. Part A describes the scope of the definitions contained therein broadly, stating that they are "[f]or the purpose of this part and all contracts, guidelines, instructions, forms and other documents related hereto." 7 C.F.R. § 246.2.

Furthermore, where USDA intended to require intent under the WIC rules, it did so expressly. For example, in contrast to the strict liability imposed for *vendor* violations, USDA defined violations by *participants*—that is, women and children receiving WIC assistance—as requiring intent. *Id.* ("Participant violation means any *intentional* action of a participant * * * that violates Federal or State statutes, regulations, policies, or procedures governing the Program.") (emphasis added). In contrast, and of critical importance here, the WIC tobacco rule does not expressly require that the agency show that the vendor intentionally accepted vouchers in exchange for tobacco. Thus, the strict liability established under the vendor violation definition applies, and Hy–Vee's asserted lack of intent to accept a WIC voucher as payment for the cigarettes does not provide a defense.

Hy–Vee also argues that the WIC program's regulatory history supports its contention that the WIC tobacco rule requires a showing that the vendor intentionally accepted a WIC voucher as the method of payment. According to Hy–Vee, the regulatory history indicates that USDA did not

intend to impose liability for "inadvertent errors."

Although it is unnecessary to look beyond the plain language of administrative rules where, as here, their meaning is unambiguous, we examine the history of the WIC rules because it demonstrates the fallacy of Hy–Vee's assertions. Contrary to Hy–Vee's argument, the history of the promulgation of the WIC rules demonstrates clearly that USDA purposefully structured the program to impose strict liability for vendor sanctions, but mollified the effect of strict liability where it thought it appropriate by adjusting the sanction imposed and the amount of misconduct that triggers the sanction. When USDA published the Final Rule promulgating the definition of "vendor violation" currently in effect, it explained that vendors are strictly liable for all actions that violate WIC regulations, whether intentional or unintentional:

> [T]he violations that trigger mandatory sanctions do not require the State agency to distinguish between fraudulent (intentional) and abusive (unintentional) vendor violations, because both types of vendor violations result in loss of program funds. The State agency is not required to demonstrate that a vendor intended to commit a vendor violation(s) to support its sanction. Instead, the State agency is required to provide evidence that the vendor committed the vendor violation(s) and that the evidence is sufficient to support the sanction being imposed.

65 Fed. Reg. 83,265–66 (Dec. 29, 2000). USDA also explained:

> As noted in the discussion of the definition of vendor violation in the proposed rule, we believe vendors should be held accountable for all violations, whether they are deliberate attempts to violate program requirements or inadvertent errors, because both ultimately result in increased food costs and fewer participants being served. * * * We want to emphasize that not all vendor violations will give rise to a vendor sanction. For example, even though an inadvertent mistake in entering the purchase price on a food instrument may constitute both a vendor violation and a vendor overcharge, it would not necessarily trigger a sanction. Only a pattern of overcharges triggers the mandatory sanction.

65 Fed.Reg. 83,260.

Hy–Vee and the dissent argue that USDA's statement that an inadvertent error may constitute a vendor violation, but not trigger a sanction, demonstrates that USDA did not intend to impose liability for inadvertent errors. In so arguing, Hy–Vee and the dissent improperly conflate the concepts of liability and sanctions. USDA's comments establish that liability arises from all violations—even inadvertent errors. But, although some inadvertent errors—like vendor overcharges—are vendor violations, they may not result in a mandatory sanction of disqualification. Accordingly, USDA requires a *pattern* of overcharge violations before it imposes a sanction. *See* 7 C.F.R. § 246.12(*l*)(1)(iii)(C) (2005). In contrast, several of the mandatory vendor sanctions are expressly triggered by just "one incidence" of the prohibited conduct, such as the sale of tobacco products in exchange for food instruments.[7] Thus, the enforce-

7. USDA explained:

> Regarding the number of incidences of each violation that trigger a mandatory sanction, the Department has determined that some violations are so serious that only one incidence warrants disqualification. For example, trafficking and the sale of alcohol or tobacco products are flagrant

ment scheme created in the federal regulations imposes strict liability for all vendor *violations,* but mandates *sanctions* for those violations according to a carefully-constructed hierarchy. In the case of the WIC tobacco rule, one incidence of a tobacco sale for a voucher constitutes a violation *and* mandates the sanction of a three-year disqualification.[8]

■ We conclude that the plain text of the rules, supported by the regulatory history, demonstrates that vendors are subject to sanction for both intentional and unintentional violations of the WIC tobacco rule. Thus, Hy–Vee's argument that proof of intent is necessary not only to establish a sale, but also regarding the method of payment, is contrary to the plain language of the rules and the considered enforcement structure created by USDA. We therefore hold that MDH properly disqualified Hy–Vee for three years. In so holding we note that our court has recognized that there are times, in applying an administrative rule in a contested case, that the result may seem harsh. *See Mammenga v. State Dept. of Human Services,* 442 N.W.2d 786, 789 (Minn.1989). However, "[t]he mere fact * * * that application of a rule [yields] a harsh or undesirable result in a particular case does not make the rule invalid." *Mammenga,* 442 N.W.2d at 789. Although the effect of the WIC tobacco rule in this context may strike some as draconian, the straightforward language of the rule and the fact that Hy–Vee sold cigarettes in exchange for a WIC food instrument mandates the conclusion that the Minnesota Department of Health properly disqualified Hy–Vee from participating in the WIC program for three years.

Affirmed.

HANSON, Justice (dissenting).

I respectfully dissent. I would conclude that Hy–Vee may avoid the 3–year sanction by proof that its acceptance of the voucher was the product of the mutual mistake of the parties to the sale. Because there are genuine issues of material fact concerning Hy–Vee's claim of mutual mistake, I would reverse the court of appeals and remand to MDH for hearing.

The WIC tobacco rule mandates a 3–year disqualification on a WIC vendor for "[o]ne incidence of the sale of * * * tobacco products in exchange for food instruments." 7 C.F.R. § 246.12(*l*)(1)(iii)(A). But the federal rule does not define the word "sale," and the state's counterpart rule does not define the word "provide."

violations of program rules and completely undermine program goals. As such, this final rule requires a mandatory sanction for one incidence of either of these violations. 64 Fed.Reg. 13,314.

8. The dissent's proposed creation of a mutual mistake affirmative defense would introduce the subjective intent of the parties as a factor in determining whether a vendor has violated the WIC tobacco rule and in doing so would undermine the carefully designed enforcement scheme described above and compromise the ability of the government to enforce the WIC tobacco rule. In cases like this one, where the objective facts unambiguously establish that a tobacco-voucher exchange took place, but a vendor produces testimony that the vendor's agent and the buyer did not subjectively intend to violate the rule, a trial will be required in which the parties' testimony regarding their subjective intent will be pitted against the objective manifestations of their conduct. USDA obviously intended to avoid such an unwieldy enforcement mechanism for vendor violations by eliminating the intent element in the vendor violation definition. Where USDA intended for intent to be a factor in the enforcement scheme, it either expressly so provided or required a pattern of conduct for imposition of a sanction. We will not disrupt that construct and substitute our judgment for that of USDA by creating an intent-based affirmative defense.

The court of appeals reconciled the parties' arguments by viewing the word "sale" in isolation and concluding that a sale does require intent but that such intent need only be proven by the parties' objective conduct (i.e., the presentation of the item, the calculation of the price, the offer and acceptance of payment and the delivery of the item). *Hy–Vee Food Stores, Inc.*, 2004 WL 2340189 at *2. I agree that the word "sale" implies an element of intent and that such intent can be proven by the objective facts and need not explore the subjective thoughts of the parties to the transaction. *See, e.g.*, Minn.Stat. § 336.2–204(1) (2002) ("contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract"); *Barker v. Allied Supermarket*, 596 P.2d 870 (Okla.1979) (holding sale occurred under Uniform Commercial Code when supermarket customer placed item in shopping cart).

But the WIC tobacco rule does not use the word "sale" in isolation. In order to give meaning to all words in the rule, "sale" must be read in conjunction with the words "in exchange for food instruments." Hy–Vee argues that the cashier and customer both intended for tobacco to be sold in exchange for cash, not for a WIC food instrument, and that their mutual mistake as to method of payment invalidated the transaction for WIC disqualification purposes. Ordinarily, as the majority notes, the method of payment would not be material to the accomplishment of a sale. But here, the violation depends precisely on the method of payment. No regulation is violated by the mere sale of cigarettes. The violation only occurs if the proscribed method of payment (exchange for food instruments) is used. Thus the question arises whether the intent element implicit in a sale also applies to the method of payment where that method is made material to the completion of the sale.[1] And, if so, may the vendor attempt to prove that there was no intent to use a WIC voucher as the method of payment by showing that the presentation and acceptance of the WIC voucher for a prohibited item was the product of a mutual mistake?

In *Winter v. Skoglund*, 404 N.W.2d 786 (Minn.1987), we endorsed the framework for analyzing mutual mistake that is provided in the Restatement (Second) of Contracts § 152 (1981):

> (1) Where a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party unless he bears the risk of the mistake under the rule stated in § 154.
>
> (2) In determining whether the mistake has a material effect on the agreed exchange of performances, account is taken of any relief by way of reformation, restitution, or otherwise.

In *Winter*, we found mutual mistake when two parties both entered a contract with the erroneous beliefs that a third party already had been bound in the agreement. 404 N.W.2d at 793. We held that "[t]his was a basic assumption on

1. The majority suggests that the appropriate framework for this question is to decouple the words of the rule into three separate elements: (1) the sale, (2) the object of the sale, and (3) the method of payment, confining the relevance of intent to only the first such element. But the rule does not separate the words in such a way, and this analytical framework does not shed any light on the question of whether the method of payment is material to the type of sale with which the rule is concerned. I read the words to be dependent, not independent, parts of the rule.

which the contract was made and its falsity would materially change the bargain." *Id.* Five years earlier, in *Gartner v. Eikill,* we found mutual mistake when parties to a property sale erroneously believed that the property could be developed. 319 N.W.2d 397, 399 (Minn.1982). We concluded that a mistake regarding the viability of property development "went to the very nature of the property." *Id.*

The facts presented here do not fit precisely within the mutual mistake framework because the mistaken tender of payment arguably took place after the customer had accepted Hy-Vee's offer of groceries. *See* Restatement (Second) of Contracts § 50(2) (1981) ("[a]cceptance by performance requires that at least part of what the offer requests be performed or tendered"). In addition, there was no mistake as to the nature of the goods being sold. But I agree with Hy-Vee that, because the use of a "food instrument" is the determinative fact under the WIC tobacco rule, the method of payment goes to the "very nature" of the transaction. *See Gartner,* 319 N.W.2d at 399. Accordingly, I would conclude that a vendor who accepts a WIC voucher in payment for cigarettes may attempt to prove that the transaction did not violate the WIC tobacco rule because the use of the voucher was the result of the mutual mistake of the parties.[2]

I reach that conclusion, in part, by applying a strict construction to the WIC tobacco rule based on the severity of the sanction. In contrast to the WIC tobacco rule, which imposes disqualification for a single incident in violation, other WIC rules require proof of a pattern or series of what appear to be regarded by the USDA as equally serious violations before a mandatory disqualification is imposed. 7 C.F.R. § 246.12(1)(iii)(B)–(F) (addressing vendor overcharges, charging for food that participant does not receive, providing credit or nonfood items, claiming reimbursement for sales that exceeds store's documented inventory, and receiving, transacting, or redeeming vouchers "outside of authorized channels"); 7 C.F.R. § 246.12(1)(iv) (addressing provision of unauthorized food items). I am reluctant to imply administrative agency authority to impose more severe sanctions where express authority to do so is not clear. *See Pet. of Northern States Power Co.,* 414 N.W.2d 383, 388 (Minn.1987) (holding that "less harsh result" was warranted when Minnesota Public Utilities Commission lacked express authority to dismiss a regulatory proceeding).

My conclusion is reinforced by the history surrounding the adoption of the WIC tobacco rule. The rule was added in 1998 as a part of a larger USDA effort to "mandate uniform sanctions across States for the most serious WIC Program vendor violations, including seven specific WIC Program violations * * *." 63 Fed.Reg. 19,415 (Apr. 20, 1998). USDA explained that "[t]he implementation of these mandatory sanctions is intended to promote WIC and [Food Stamp Program] coordination in the disqualification of retailers and ven-

2. I acknowledge that mutual mistake is more commonly used as a contract doctrine that may apply when a party to a contract seeks to void it. But I would conclude that the underlying principles of the mutual mistake doctrine provide an appropriate framework, by analogy, both for addressing the intent elements implicit in the rule and allocating the burden of proof concerning those elements. Moreover, the affidavits of the parties to the transaction suggest that each would gladly void the transaction and substitute cash as the method of payment. I see no purpose being served by any requirement that the parties go through formal steps of rescission in order to avail themselves of the rationale of the doctrine.

dors who violate program rules." *Id.* at 19,416. At the time, there was a "major movement in the USDA to control fraud and abuse in the WIC Program." Brandi M. King, Note, *Separating Food from Culture: The USDA's Failure to Help Its Culturally Diverse WIC Population,* 6 Drake J. Agric. L. 223, 237 (2001). In a report to Congress about the changes, the General Accounting Office observed that vendors' "intentional" and "deliberate" actions were the chief concern:

> Vendor fraud or abuse is an intentional or deliberate action taken to violate program regulations, policies, or procedures. Actions include, but are not limited to, accepting food vouchers for cash, which is known as trafficking, or providing credit toward the purchase of unauthorized items; giving cash or credit for returned food items that were purchased with food vouchers; altering food vouchers or accepting expired vouchers; charging more than the shelf price or exceeding the maximum price allowed by WIC; or charging for food that the participant does not receive.

*Food Assistance: Efforts to Control Fraud and Abuse in the WIC Program Can Be Strengthened* (United States General Accounting Office, Report to Congressional Committees, August 1999), at 17, *available at* http://www.fns.usda .gov/wic/resources/ Efforts.pdf (last visited Sept. 29, 2005).

The majority relies on USDA's definition of "vendor violation" for guidance in gauging the intent behind the WIC tobacco rule. A "vendor violation" is defined as "any intentional or unintentional action of a vendor's current owners, officers, managers, agents, or employees (with or without the knowledge of management) that violates the vendor agreement or Federal or State statutes, regulations, policies, or procedures governing the Program." 7 C.F.R. § 246.2. In recommending Hy-Vee's disqualification, the ALJ relied in part on this definition, and the court of appeals concluded that the regulatory history of the "vendor violation" definition "expressly provides that state agencies are not required to show that a vendor intended the violation." *Hy-Vee Food Stores, Inc.,* 2004 WL 2340189 at *2.

But I find the history of this definition to be contradictory. It is true that when USDA proposed this definition of "vendor violation" in 1999, it explained that vendors were to be held accountable for "deliberate" violations as well as "inadvertent" errors because both "ha[d] the same negative effect on the Program." 64 Fed. Reg. 32,316 (June 16, 1999). But, in the same explanation, USDA observed that "this does not mean that a minor unintentional action by a cashier without management knowledge would result in disqualification." *Id.* This observation states the ultimate conclusion that is to be reached by applying the definition to a specific set of facts—that no disqualification will result, and a vendor violation does not occur, when a cashier commits a "minor unintentional" error without management knowledge. This ultimate conclusion is instructive on how the definition of vendor violation should be applied here because these are the precise facts—an unintentional error—that the ALJ assumed to be true for purposes of summary disposition.

This contradiction in the "vendor violation" definition history was underscored when the rule was being made final late in 2000. USDA then observed that "limiting the scope of vendor overcharges only to those that are intentional or fraudulent would undermine the integrity of the WIC Program," but again stated that "[w]e want to emphasize that not all vendor violations will give rise to a vendor sanction" and that an "inadvertent mistake" may not

trigger a sanction. 65 Fed.Reg. 83,260–61 (Dec. 29, 2000).[3]

Of course, as Hy–Vee argues, any attempt to use the definition of "vendor violation" to determine whether a violation has occurred is necessarily circular—it presumes the existence of the underlying violation that is in question. Moreover, the term "vendor violation" is not used in the WIC tobacco rule. Where it is used in other rules, an array of possible sanctions is provided. For example, the sanctions for "vendor violations" that states must describe in vendor contracts include withholding of payment of vendor claims, "administrative fines, disqualification and civil money penalties in lieu of disqualification." 7 C.F.R. § 246.12(h)(3)(ix), (xviii) (2005). Thus, although the definition of vendor violation contemplates strict liability, the administrator is given significant discretion when choosing the sanction.[4] All of this suggests that the definition of vendor violation has no application here.

I realize that USDA and MDH have strong interests in ensuring that WIC-eligible women and children are not exposed to tobacco or alcohol. But given the ambiguities and contradictory comments in the promulgation history, I am not prepared to characterize a single, inadvertent sale of tobacco in exchange for a WIC voucher as a violation that triggers the 3–year mandatory disqualification.

I would hold that when a WIC vendor appeals to MDH from a mandatory 3–year disqualification under 7 C.F.R. 246.12(*l*)(1)(iii)(A), the vendor may show, as an affirmative defense, that the vendor's acceptance of a WIC voucher in exchange for tobacco products was the result of a mutual mistake of the parties to the transaction. *See Theisen's, Inc. v. Red Owl Stores, Inc.*, 309 Minn. 60, 65, 243 N.W.2d 145, 148 (1976) (party seeking reformation of written instrument because of mutual mistake bears burden of proof); *see also Bryan v. Moore*, 863 A.2d 258, 260 n. 4 (Del.Ch.2004) (characterizing mutual mis-

3. In addition, I question whether this definition of "vendor violation" was meant to be applied outside the context of "overcharges," for which a "pattern" of wrongdoing is required before a disqualification must be imposed. 7 C.F.R. 246.12(*l*)(1)(iii)(C). After USDA published the proposed definitions of "vendor violations" and "vendor overcharges" in the Federal Register, two commenters objected to the use of the word "unintentional" in the definition of vendor overcharges. 65 Fed.Reg. 83,261. In explaining its rationale, USDA observed that "limiting the scope of vendor overcharges only to those that are intentional or fraudulent would undermine the integrity of the WIC Program." *Id.* In contrast, when two commenters objected to the use of the word "unintentional" in the definition of "vendor violations," the USDA responded quite differently:

> We acknowledged the complexity of WIC transactions and noted that even with training and supervision, cashiers may occasionally make unintentional errors. We also stated that the State agency has a wide range of actions that it may take as a result of a vendor violation, including assessing a claim, requiring increased training, identifying the vendor as a high-risk vendor subject to compliance investigation, and imposing a sanction.

65 Fed. Reg. 83,260.

4. Other uses of the term "vendor violation" provide the vendor with an opportunity to correct the error. *See, e.g.,* 7 C.F.R. § 246.12(k)(2) (2005) ("When the State agency determines that the vendor has committed a vendor violation that affects the payment to the vendor, the State agency must delay payment or establish a claim. Such vendor violations may be detected through compliance investigations, food instrument reviews, or other reviews or investigations of a vendor's operations."); and 7 C.F.R. § 246.12(k)(3) (2005) (stating that when payment "is delayed or a claim is established, the State agency must provide the vendor with an opportunity to justify or correct the vendor overcharge or other error").

take as affirmative defense); *Smith v. First Choice Services,* 158 N.C.App. 244, 580 S.E.2d 743, 748 (2003) (same). Because Hy–Vee made such a showing, sufficient to avoid summary disposition, I would determine that the grant of summary disposition in favor of MDH was affected by an error of law.

PAGE, Justice (dissenting).

I join in the dissent of Justice Hanson.